**William Matthew SCHIFFERT a/k/a Jerry Schiffert, Appellant,**

v.

**The STATE of Texas, State.**

**No. 2–02–278–CR.**

Court of Appeals of Texas, Fort Worth.

Dec. 23, 2004.

Lisa Mullen, Fort Worth, for Appellant.

Tim Curry, Crim. Dist. Atty., Charles M. Mallin, Chief Appellate Division, Sylvia Mandel, James R. Hudson, Asst. Dist. Atty's For Tarrant County, Fort Worth, for Appellee.

Panel A: CAYCE, C.J.; LIVINGSTON and GARDNER, JJ.

ANNE GARDNER, Justice.

## OPINION ON REHEARING

The State has filed a motion for rehearing regarding our original opinion and judgment. We withdraw our opinion and judgment of August 12, 2004 and substitute the following. We overrule the motion for rehearing.

## I. INTRODUCTION

A jury convicted Appellant William Matthew Schiffert as a party of the first-degree felony offense of murder, found the habitual offender allegations true, and assessed Appellant's punishment at seventy-five years' confinement in the Institutional Division of the Texas Department of Criminal Justice. *See* TEX. PENAL CODE ANN. § 19.02(b), (c) (Vernon 2003), § 12.42 (Vernon Supp.2004–05). The trial court sentenced Appellant accordingly. On appeal, Appellant raises four points: (1) the trial court egregiously erred in the parties application paragraph of the jury charge by failing to require the State to prove intent; (2) the evidence is factually and legally insufficient; (3) trial counsel was ineffective; and (4) the trial court erred in the self-defense portion of the jury charge. We will reverse and remand.

## II. LEGAL SUFFICIENCY

### A. Standard of Review

In his second point, Appellant claims that the evidence presented at trial is le-

gally and factually insufficient to support his conviction. The jury was authorized by the trial court's charge to convict Appellant of murder as either a primary actor or as a party. *See id.* §§ 7.01, 7.02. The jury returned a general verdict, finding Appellant guilty of murder. *See id.* § 19.02.

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Burden v. State,* 55 S.W.3d 608, 612 (Tex.Crim.App. 2001). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. When performing a legal sufficiency review, we may not sit as a thirteenth juror, re-evaluating the weight and credibility of the evidence and, thus, substituting our judgment for that of the fact finder. *Dewberry v. State,* 4 S.W.3d 735, 740 (Tex. Crim.App.1999), *cert. denied,* 529 U.S. 1131, 120 S.Ct. 2008, 146 L.Ed.2d 958 (2000).

When a jury returns a general verdict and the evidence is sufficient to support a guilty finding under any of the allegations submitted, the verdict will be upheld. *Swearingen v. State,* 101 S.W.3d 89, 95 (Tex.Crim.App.2003); *Tippitt v. State,* 41 S.W.3d 316, 323 (Tex.App.-Fort Worth 2001, no pet.). Thus, we apply the legal sufficiency standard of review to each theory submitted to the jury in the court's charge. *Rabbani v. State,* 847 S.W.2d 555, 558 (Tex.Crim.App.1992), *cert. denied,* 509 U.S. 926, 113 S.Ct. 3047, 125 L.Ed.2d 731 (1993); *Tippitt,* 41 S.W.3d at 323.

## B. Evidence at Trial

The evidence presented at trial indicated that Brandy Upchurch began dating the victim, Corey McMillan, in 1999. Soon after, they began living together and eventually moved into the Budget Inn motel. According to a statement that Appellant gave to the police, Appellant first met Brandy Upchurch when he went to the motel to visit a friend. Upchurch told Appellant that she couldn't come outside because her "old man [McMillan] would beat her." Appellant continued to talk to Upchurch whenever he went to the motel.

Ultimately, Upchurch left McMillan and moved into Appellant's trailer. About a month later, Appellant arrived at the trailer and found Upchurch gone. According to Upchurch, McMillan had found her in Appellant's trailer, and after he threatened her, she went back with him to the motel. The following day, November 5, 2001, Upchurch called Appellant to come get her; she told him that she had been kidnapped by McMillan and that she wanted Appellant to come pick her up. Appellant and his nephew, Aaron Kennedy, went to the motel to get her.

In the meantime, after a confrontation with McMillan, Upchurch left the motel on foot. She was picked up by Appellant and Kennedy in a restaurant parking lot. The three of them went back to the motel to get Upchurch's clothes. When Appellant, Kennedy, and Upchurch arrived at the motel, Appellant drove the truck near the motel doors, so that Kennedy could jump out and grab Upchurch's belongings, which were in a neighbor's room.

GinnyLu Ward was in the parking lot of Enterprise Rent–A–Car, which shares the lot with the motel, when the events transpired. According to Ward, when Appel-

lant drove into the motel parking lot, he "acted like [he] didn't see who [he was] looking for, and [then he] made a U-turn." Upchurch testified that Appellant stopped the car and called McMillan on the phone and said, "I'm looking at your punk bitch now." However, the car kept rolling and almost hit a fire hydrant; Appellant swung the car around and hit a truck. Soon afterwards, McMillan came out into the parking lot. According to Ward, "[the driver] saw who [he was] looking for and [he] gunned it, and when he gunned it, he lost control for just a moment and hit [a] red truck."

Appellant then came back around to the motel doors, and Kennedy jumped out of the car and began stabbing McMillan. Ward testified that, as Kennedy stabbed McMillan, McMillan said, "[W]hat the hell are you doing?" and "[W]hy are you here?" According to Ward, Appellant was the driver of the vehicle, and he parked it twelve to fifteen inches behind McMillan's car, so that McMillan's car could not have been backed out without running into Appellant's car. While Kennedy was stabbing McMillan, Ward said that Appellant turned to her and "smirked." After a short time, Kennedy got back in the car, and Appellant quickly drove away. As the car left the lot, Upchurch looked back; she saw McMillan's hand over his throat and blood on his shirt.

Officer Michael McGuire was dispatched to the motel, where he found McMillan, who was bleeding and appeared to have been stabbed in the left side of his neck and on the left side of his chest. McMillan was taken to the hospital, where he subsequently died. Detective Tim Gilpin was also dispatched to the scene. He noticed a red pickup truck in the parking lot; the left bumper area of the truck had been struck. Based on information that he received from interviewing witnesses at the scene, Gilpin ran a license plate number and found that the registered owner of the car was Appellant.

The day after McMillan's death, Officer Richard Curtis, who was assigned to the Crime Scene Search Unit, was dispatched to an apartment complex after a search warrant had been obtained for Appellant's vehicle. The car was found at the complex and the police impounded it. While examining the car, Curtis stated that he had trouble getting the driver-side door open; the door would open only about twelve inches. There was one license plate on the car, but it was not registered to the car.

Upchurch said that, in the days following McMillan's death, she saw Appellant, and he and Kennedy were trying to stay separate from each other. She also stated that she heard Appellant discuss leaving town because he was on parole and he was afraid that the police would be looking for him.

On November 9, 2001, Officer Benjamin Jones was on patrol when he saw a car with a brake light out. He pulled over the car and asked for identification, but the driver had none. The driver gave his name as "Michael Smith." Officer Kenneth Stack arrived on the scene after Jones had pulled over the car. Based on a photo that he had seen earlier that day, Stack recognized Appellant as the driver. According to Stack, when he showed the photo to Appellant, Appellant said, "You got me."

According to Deputy Medical Examiner Daniel Konzelmann, McMillan's body had two distinct stab wounds, one on the chest and one on the neck. The neck wound was not lethal because it did not cross any vital structures. The wound to the chest was lethal because it went into the heart. Konzelmann saw no defensive wounds on McMillan's upper arms or hands and no signs indicating a prolonged struggle.

## C. Analysis

■ The evidence clearly established that Aaron Kennedy, not Appellant, stabbed and killed Corey McMillan with a knife. Therefore, the evidence was legally insufficient to support Appellant's conviction as a primary actor. *See, e.g., Tippitt,* 41 S.W.3d at 323. Thus, in finding Appellant guilty of murder, the jury necessarily concluded that Appellant was guilty as a party.

The Texas penal code states that "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE ANN. § 7.01(a). Criminal responsibility is defined several ways, one of which is that the defendant, "acting with intent to promote or assist the commission of the offense … solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2).

The abstract portion of the charge submitted to the jury stated the following, in relevant part:

> All persons are parties to an offense who are guilty of acting together in the commission of the offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for whom he is criminally responsible, or by both.
>
> A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Mere presence alone will not constitute one a party to an offense.

The application portion of the jury charge stated, in relevant part, that the jury was authorized to find Appellant guilty of murder if it found that

> Aaron Kennedy did … intentionally with the intent to cause serious bodily injury to Corey McMillan, commit an act clearly dangerous to human life, namely, to stab him with a knife, which caused the death of an individual, Corey McMillan, and you further find that the Defendant, William Matthew Schiffert, acted with intent to solicit, encourage, direct, aid, or attempt to aid Aaron Kennedy in the commission of the offense. …

The abstract portion of the charge correctly stated that criminal responsibility requires both (1) acting with intent to promote or assist the commission of the offense and (2) soliciting, encouraging, directing, aiding, or attempting to aid the other person to commit the offense. *See id.* However, the application portion of the charge erroneously authorized conviction of Appellant as a party if the jury found only that he acted with intent to solicit, encourage, direct, aid, or attempt to aid Aaron Kennedy in the commission of the offense. In other words, the application portion of the charge required neither acting with intent to promote or assist the commission of the offense, nor soliciting, encouraging, directing, aiding, or attempting to aid Kennedy in the commission of the offense. Instead, it required only acting with intent to solicit, encourage, direct, aid, or attempting to aid Kennedy in the commission of the offense. This is contrary to the elements of the offense, as defined by statute. *See id.*

■ However, sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case. *Malik v. State,* 953 S.W.2d 234, 240 (Tex. Crim.App.1997). This hypothetical charge accurately sets out the law, is authorized

by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.*

The hypothetically correct jury charge would have properly authorized the jury to convict Appellant if it found that he acted with intent to promote or assist Aaron Kennedy in the stabbing death of Corey McMillan, and that he solicited, encouraged, directed, aided, or attempted to aid Kennedy in the stabbing death of McMillan. Using this approach, we find that the evidence is legally sufficient to support Appellant's conviction.

Appellant was driving the car when he, Kennedy, and Upchurch arrived at the motel. According to a witness, Appellant seemed to be looking for someone as he drove through the parking lot. Appellant called McMillan from his car and told him, "I'm looking at your punk bitch now." When he saw McMillan, he "gunned" the car. Appellant subsequently parked behind McMillan's car, and then Kennedy jumped out of the car and began stabbing McMillan. The jury could rationally have inferred that Appellant's focus was on McMillan, rather than getting Upchurch's belongings, and that Appellant used what Upchurch conceded were "fighting words" toward McMillan. Moreover, a rational jury could conclude that by parking behind McMillan's car, Appellant wanted to ensure that McMillan did not leave the area.

Given all this evidence, as well as the speed with which Kennedy jumped from Appellant's car and began stabbing McMillan, a rational jury could conclude that Appellant acted with the intent to assist Kennedy in the stabbing of McMillan, and that he solicited, encouraged, directed, aided, or attempted to aid Kennedy in the stabbing of McMillan. Thus, we find that,

viewing the evidence in the light most favorable to the verdict, a rational jury could have found beyond a reasonable doubt that Appellant was guilty of murder as a party. The legal-sufficiency portion of Appellant's second point is overruled.

## III. FACTUAL SUFFICIENCY

### A. Standard of Review

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence, both for and against the finding, in a neutral light, favoring neither party. *See Zuniga v. State,* 144 S.W.3d 477, 481 (Tex.Crim.App.2004). The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact finder was rationally justified in finding guilt beyond a reasonable doubt. *Id.* at 484. There are two ways evidence may be factually insufficient: (1) the evidence supporting the verdict or judgment, considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt; or (2) when there is evidence both supporting and contradicting the verdict or judgment, weighing all of the evidence, the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt. *Id.* at 484–85. "This standard acknowledges that evidence of guilt can 'preponderate' in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt." *Id.* at 485. Evidence supporting a guilty finding may legally support a rational jury's conclusion, but nevertheless be so weak that it does not support the finding of guilt beyond a reasonable doubt. *See id.* In performing a factual sufficiency review, we are to give deference to the fact finder's determinations, including determinations involving the credibility and demeanor of witnesses. *Id.* at 481; *Cain v. State,* 958 S.W.2d 404, 407 (Tex.Crim.App.1997). We

may not substitute our judgment for that of the fact finder. *Zuniga,* 144 S.W.3d at 482.

### B. *Vodochodsky v. State*

Recently, the Court of Criminal Appeals held, in a capital murder case, that the evidence presented at trial was factually insufficient to support the jury's verdict that the defendant was guilty as a party to the offense. *Vodochodsky v. State,* No. 74129, 2004 WL 840121, at *6–7, —— S.W.3d —— at —— – ——— (Tex.Crim.App. Apr.21, 2004). Because that case also deals with party liability, a comparison between it and the instant case is useful in determining whether the evidence is factually sufficient to support Appellant's liability as a party to an offense.

In that case, the primary actor, Jeremiah Engleton, ambushed and killed two sheriff's deputies and a state trooper before killing himself. *Id.* at *1, at ——. The defendant, Engleton's friend, was tried for and convicted of the capital murder of a peace officer who was acting in the lawful discharge of an official duty. *Id.*

The evidence indicated that Engleton, his wife Violet, her sister Sara, and Sara's boyfriend, the defendant, lived together. *Id.* Following a deputy's response to Engleton's violent behavior toward his wife one night, Engleton said to the defendant, "Do you remember what we've been talking about? I'm going to do it right now." *Id.* at *2, at ——. The defendant replied, "No, it's not worth it." *Id.* Engleton was subsequently arrested for his violent behavior and while in jail, he told one of his cellmates that "[t]hese motherfuckers don't know what they got coming" and that it was going to make the front page. *Id.* While in jail, Engleton called the defendant and told him to make sure that Engleton's wife did not take his semiautomatic assault rifle or his semiautomatic pistol.

*Id.* Engleton also told another cellmate that he had been arrested for domestic violence and that when he got out, he "had plans and planned to make some headlines." *Id.* In another telephone conversation, Engleton asked the defendant to take care of his belongings, and he specifically mentioned the assault rife. *Id.* Engleton also told the defendant to bring $1,000.00 that Engleton had left him, to make his bail. *Id.*

After Engleton was freed on bail, the defendant accompanied Engleton to a gun shop where Engleton purchased several boxes of ammunition. *Id.* When Engleton and the defendant arrived home, no one else was there. *Id.* Sara subsequently called the house, and the defendant told her that Engleton had left. *Id.* Sara, Violet, and the defendant's brother then drove toward the residence. *Id.* When they arrived, they saw Engleton's vehicle and continued on to a grocery store in Pleasanton. *Id.* Sara then called the defendant again. *Id.* At first, the defendant acted like he was angry because they had not shown up, but then he dropped his voice to a whisper and told Sara not to come home. *Id.* Instead, he told her that he would meet her at his brother's house later. *Id.*

Subsequently, while the defendant was still at the house, a bogus 911 call was placed to the County Sheriff's Office from the house. *Id.* at *3, at ——. Over the next several hours, Engleton killed two officers who had been dispatched to his residence, took one of the officers' guns, and wounded several other officers. *Id.* Before he could be taken into custody, he killed himself. *Id.* at *4, at ——. Just prior to the killings, a neighbor saw the defendant taking some of his belongings from the house to his vehicle. *Id.* at *3, at ——.

Two days later, the defendant talked to a neighbor about the killings, telling him

that he had bailed Engleton out of jail "[t]o do this." *Id.* at \*4, at ——. The defendant also told the neighbor that the night that Engleton was initially arrested for assaulting his wife, Engleton wanted to kill the officer who came to arrest him, but the defendant told Engleton, "No, . . . we ain't got nothing planned yet." *Id.* Finally, the defendant also told his neighbor that he knew that Engleton had gone "over the edge" when he took the deputy's gun. *Id.*

Although the Court of Criminal Appeals concluded that the evidence was legally sufficient, it held that it was factually insufficient to support the defendant's conviction as a party. *Id.* at \*5–6, at —— ——. The court noted that when Engleton expressed a desire to "do it right now" and the defendant told him they did not yet have a plan, neither man specifically mentioned killing a peace officer. *Id.* at \*6, at ——. Also, when the defendant stated that he bailed Engleton out of jail "to do this," he did not specifically state that he bailed him out as part of a plan to kill police officers. *Id.* Although the defendant removed belongings from the house, the court pointed out that there was no proof that he did so as part of a murderous plot. *Id.* Finally, the court pointed out the defendant's comment that Engleton had "gone over the edge" when he took the deputy's gun could just as reasonably have been a speculative comment, rather than one indicating that he had witnessed the officer's murder. *Id.*

Thus, according to the court, none of the evidence presented at trial necessarily suggested that the defendant acted with intent to promote or assist Engleton. *Id.* None of his statements directly referred to killing police officers, they were devoid of information on the details of the alleged murder plot, and there was no other information in the record suggesting that the defendant was planning the event with Engleton. *Id.*

Also, other evidence suggested that the defendant was not working with Engleton. *Id.* His whispered warning to his wife could indicate that while he may have known of Engleton's plan, he was not a party to it. *Id.* He did not participate in the purchase of ammunition, and there was no evidence that the defendant actually did any affirmative act to assist Engleton with the plan. *Id.*

## C. Analysis

■ As in *Vodochodsky,* all of the evidence in the instant case detailed above, that could legally support a rational jury's conclusion, is nevertheless so weak when viewed in a neutral light that our confidence in the verdict is undermined. Here, there was no evidence of any kind of conversations or planning on the part of Appellant and Kennedy. The witness who saw Kennedy stab McMillan stated that she did not know if Appellant said anything to Kennedy just before Kennedy got out of the car and began stabbing McMillan. Moreover, there was no evidence that Appellant knew that Kennedy intended to stab McMillan or, indeed, that Kennedy even had a knife. The testimony of the witness that Appellant looked at her during the stabbing indicates that he may not even have been aware that Kennedy was stabbing McMillan. Finally, Appellant's attempts to avoid the police do not necessarily suggest that he had acted with intent to promote or assist Kennedy. After the stabbing, Appellant expressed fear that the police would be looking for him because he was on parole and certainly knew that the police would want to speak with him about what happened.

Thus, we conclude that the proof of Appellant's guilt as a party is too weak to support the finding of guilt beyond a rea-

sonable doubt. The factual-sufficiency portion of Appellant's second point is sustained.

## IV. CONCLUSION

Because we conclude that the evidence is factually insufficient to support Appellant's conviction, we reverse the judgment of the trial court and remand this cause for a new trial. *See Zuniga*, 144 S.W.3d at 482; *Clewis v. State*, 922 S.W.2d 126, 135 (Tex.Crim.App.1996).[1]

---

1. In light of our reversal of this cause for factual insufficiency, we find it unnecessary to address Appellant's remaining points. *See* Tex.R.App. P. 47.1.