COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**


NO. 2-02-278-CR

WILLIAM MATTHEW SCHIFFERT                                    APPELLANT
A/K/A JERRY SCHIFFERT

V.

THE STATE OF TEXAS                                                      STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 1 OF TARRANT COUNTY

------------

## OPINION ON PETITION FOR DISCRETIONARY REVIEW

------------

After reviewing Appellant's petition for discretionary review, we modify our opinion and judgment in this appeal. *See* TEX. R. APP. P. 50. We withdraw our November 21, 2007 opinion and judgment and substitute the following.

**I.      Introduction**

A jury convicted Appellant William Matthew Schiffert a/k/a Jerry Schiffert as a party to the murder of Corey McMillan, found habitual offender allegations

to be true, and assessed Appellant's punishment at seventy-five years' confinement. The trial court sentenced Appellant accordingly. On appeal, Appellant raises four points: (1) the trial court egregiously erred in the parties application paragraph of the jury charge by failing to require the State to prove intent; (2) the evidence is legally and factually insufficient; (3) trial counsel was ineffective; and (4) the trial court erred in the self-defense portion of the jury charge.

In our original opinion and judgment, we held that the evidence was legally sufficient but factually insufficient under the standards of review in effect at the time.[1] On November 22, 2006, the court of criminal appeals vacated our opinion and judgment and remanded the case for reconsideration in light of its opinion in *Watson v. State*,[2] in which it re-articulated the factual sufficiency standard of review. *Schiffert v. State*, 207 S.W.3d 800, 801 (Tex. Crim. App. 2006). Reconsidering the factual sufficiency point in light of *Watson*, and reaching the remaining issues that we did not reach in our original opinion, we affirm.

---

[1] *Schiffert v. State*, 157 S.W.3d 491, 496, 499 (Tex. App.—Fort Worth 2004), *rev'd and judgm't vacated*, 207 S.W.3d 800 (Tex. Crim. App. 2006).

[2] 204 S.W.3d 404, 415-17 (Tex. Crim. App. 2006).

## II.     Background

Brandy Upchurch began dating McMillan in 1999. Soon after, they began living together and eventually moved into the Budget Inn motel. According to a statement that Appellant gave to the police, Appellant first met Upchurch when he went to the motel to visit a friend. Upchurch told Appellant that she could not come outside because her "old man [McMillan] would beat her." Appellant continued to talk to Upchurch whenever he went to the motel.

Ultimately, Upchurch left McMillan and moved into Appellant's trailer. About a month later, Appellant arrived at the trailer and found Upchurch gone. According to Upchurch, McMillan had found her in Appellant's trailer, and after he threatened her, she went back with him to the motel. The following day, November 5, 2001, Upchurch called Appellant to come get her; she told him that she had been kidnapped by McMillan and that she wanted Appellant to come pick her up. Appellant and his nephew, Aaron Kennedy, went to the motel to get her.

In the meantime, after a confrontation with McMillan, Upchurch left the motel on foot. She called Appellant and Kennedy, who picked her up in a nearby restaurant parking lot. The three of them then drove back to the motel parking lot. Upchurch first testified that their purpose in returning to the motel

3

was to retrieve her clothes, but on cross-examination she testified she expected to go to Appellant's trailer, not back to the motel.

GinnyLu Ward was in the parking lot of Enterprise Rent-A-Car, which shares the lot with the motel, when the events transpired. According to Ward, when Appellant drove into the motel parking lot, he "acted like [he] didn't see who [he was] looking for, and [then he] made a U-turn." Upchurch testified that Appellant stopped the car, called McMillan on the phone and said, "I'm looking at your punk bitch now." Soon afterwards, McMillan came out into the parking lot. According to Ward, "[the driver] saw who [he was] looking for and [he] gunned it, and when he gunned it, he lost control for just a moment and hit [a] red truck." The collision damaged the driver's door of Appellant's car; Upchurch testified that they later had to pry the door open. Upchurch also admitted on cross-examination that she told the prosecutor before trial that Appellant tried to run over McMillan at some point during the incident.[3]

Ward testified that Appellant parked his car twelve to fifteen inches behind McMillan's car in such a way that McMillan's car could not have pulled

---

[3] Upchurch testified that Appellant attempted to run over McMillan "when they were starting to fight, him and Aaron, and all he was trying to do was stop them." But Ward did not mention Appellant moving his car between the time he stopped and the time he fled with Kennedy; instead, she testified that Appellant was "smirking" at her during this period.

out without hitting Appellant's car. Kennedy then jumped out of the car and began stabbing McMillan. Ward testified that, as Kennedy stabbed McMillan, McMillan said, "[W]hat the hell are you doing?" and "[W]hy are you here?" Ward said that as Kennedy was stabbing McMillan, Appellant turned to her and "smirked."

Kennedy got back in the car, and Appellant quickly drove away. As the car left the lot, Upchurch looked back; she saw McMillan's hand over his throat and blood on his shirt.

Officer Michael McGuire was dispatched to the motel, where he found McMillan, who was bleeding and appeared to have been stabbed in the left side of his neck and on the left side of his chest. McMillan was taken to the hospital, where he later died. Detective Tim Gilpin was also dispatched to the scene. Witnesses gave him the license number of the car Appellant was driving; he ran the license and learned the car was registered to Appellant.

The day after McMillan's death, Officer Richard Curtis, who was assigned to the Crime Scene Search Unit, was dispatched to an apartment complex after a search warrant had been obtained for Appellant's vehicle. Police found the car at the complex and impounded it. While examining the car, Curtis stated that he had trouble getting the driver's-side door open; the door would open

5

only about twelve inches.  There was one license plate on the car, but it was not registered to the car.

Upchurch said that, in the days following McMillan's death, she saw Appellant, and he and Kennedy tried to stay separate from each other. She also stated that she heard Appellant discuss leaving town because he was on parole and he was afraid that the police would be looking for him.

On November 9, 2001, Officer Benjamin Jones was on patrol when he saw a car with a brake light out.  He pulled the car over and asked for identification, but the driver had none.  The driver gave his name as "Michael Smith."  Officer Kenneth Stack arrived on the scene after Jones had stopped the car.  Based on a photo that he had seen earlier that day, Stack recognized Appellant as the driver.  According to Stack, when he showed the photo to Appellant, Appellant said, "You got me."

According to Deputy Medical Examiner Daniel Konzelmann, McMillan's body had two distinct stab wounds, one on the chest and one on the neck. The neck wound was not lethal because it did not cross any vital structures. The wound to the chest was lethal because it went into the heart.  Konzelmann saw no defensive wounds on McMillan's upper arms or hands and no signs indicating a prolonged struggle.

6

### III. Charge Error: The Law of Parties

In his first point, Appellant argues that the trial court erred by misstating the law of parties in the application paragraph of the jury charge and that the error caused Appellant egregious harm.

#### A. Standard of review

Appellate review of error in a jury charge involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). Initially, we must determine whether error occurred. If so, we must then evaluate whether sufficient harm resulted from the error to require reversal. *Id.* at 731–32. If there is error in the court's charge but the appellant did not object to it at trial, we must decide whether the error was so egregious and created such harm that appellant did not have a fair and impartial trial—in short, that "egregious harm" has occurred. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see* TEX. CODE CRIM. PROC. ANN. art. 36.19 (Vernon 1981); *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996). Jury charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007); *Hutch*, 922 S.W.2d at 171.

When examining the record to determine whether jury-charge error is egregious, the reviewing court should consider the entirety of the jury charge itself, the evidence, including the contested issues and weight of the probative evidence, the arguments of counsel, and any other relevant information revealed by the record of the trial as a whole. *Stuhler*, 218 S.W.3d at 719; *Bailey v. State*, 867 S.W.2d 42, 43 (Tex. Crim. App. 1993); *Almanza*, 686 S.W.2d at 171. The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused. *Almanza*, 686 S.W.2d at 174. Egregious harm is a difficult standard to prove and must be determined on a case-by-case basis. *Ellison v. State*, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002); *Hutch*, 922 S.W.2d at 171.

## B. The charge

The Texas Penal Code states that "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE ANN. § 7.01(a) (Vernon 2005). Criminal responsibility is defined several ways, one of which is that the defendant, "acting with intent to promote or assist the commission of the offense . . . solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id*. § 7.02(a)(2).

8

The abstract portion of the charge submitted to the jury stated, in relevant part:

> All persons are parties to an offense who are guilty of acting together in the commission of the offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for whom he is criminally responsible, or by both.
>
> A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Mere presence alone will not constitute one a party to an offense.

The application portion of the jury charge stated, in relevant part, that the jury was authorized to find Appellant guilty of murder if it found that

> Aaron Kennedy did . . . intentionally with the intent to cause serious bodily injury to Corey McMillan, commit an act clearly dangerous to human life, namely, to stab him with a knife, which caused the death of an individual, Corey McMillan, and you further find that the Defendant, William Matthew Schiffert, acted with intent to solicit, encourage, direct, aid, or attempt to aid Aaron Kennedy in the commission of the offense . . . .

Thus, while the abstract portion of the charge tracked the language of section 7.02(a)(2), the application portion did not. Appellant did not object to this discrepancy at trial.

### C. Analysis

Although the charge erroneously failed to track the language of penal code section 7.02(a)(2), we hold that Appellant cannot show egregious harm

9

because the charge required affirmative jury findings on the same elements as those recited in the penal code. *See Almanza,* 686 S.W.2d at 171.

The elements of party liability under penal code section 7.02(a)(2) are (1) acting with intent that the offense be committed, (2) the defendant solicits, encourages, directs, aids, or attempts to aid (3) another person to commit an offense. TEX. PENAL CODE ANN. § 7.02(a)(2). The charge authorized the jury to find Appellant guilty as a party if he (1) acted with intent (2) to solicit, encourage, direct, aid, or attempt to aid (3) Kennedy in the commission of the offense. The order of the words is different, but the meaning is the same: the jury could not find Appellant guilty as a party unless it found that he intended the commission of McMillan's murder. The charge required the jury to find that Appellant committed some act intended to solicit, encourage, direct, aid, or attempt to aid in McMillan's murder; section 7.02(a)(2) requires the same findings. Though the words "acted with intent" are separated from the words "commission of the offense" in the charge, the former modify the latter.

Stated differently, the phrase "acting with intent to promote or assist the commission of the offense" in the penal code has the same practical meaning and requires the same findings as the phrase "acted with the intent to solicit, direct, aid, or attempt to aid . . . the commission of the offense" in the charge. The words "solicit" and "direct" are roughly synonymous with the word

10

"promote," and the word "aid" is closely synonymous with the word "assist."

Thus, while the charge reordered the words used in the statute, the intent

required by the charge is the same as the intent required by the statute.[4]

Because the charge's application paragraph required the jury to find the

same elements of party liability listed in section 7.02(a)(2), we hold the error

did not cause egregious harm to Appellant, and we overrule his first issue.

## IV.    Charge Error: Self Defense

In his fourth point, Appellant argues the trial court erred by submitting an

erroneous self-defense instruction to the jury.  The State argues that even if the

charge was erroneous, Appellant did not suffer egregious harm because no

rational jury could have found that Appellant or Kennedy acted in self-defense.

---

[4] This analysis provokes the question of why the legislature included
both the phrase "acting with intent to promote or assist the commission of the
offense" and the phrase "solicits, directs, aids, or attempts to aid the other
person to commit the offense" in section 7.02(a)(2)'s definition of party
liability.  One reason is that in some situations, an actor may aid another in the
commission of an offense without intending that an offense be committed if the
actor does not know the other's conduct is an offense; under that
circumstance, the actor is not a party to the offense. *See, e.g., Amaya v.
State*, 733 S.W.2d 168, 175 (Tex. Crim. App. 1986) (holding defendants could
not be guilty as parties when the State failed to show they "knew the
criminality of the conduct they assisted").  Such lack of knowledge is not a
factor in a murder prosecution like this one. *See id.* at 174 ("[Murder] is
conduct that *by its very nature* supplies proof of the parties' knowledge that it
is 'criminal.'").

11

### A. The self-defense instruction

The trial court's instruction on self-defense reads, in pertinent part, as follows:

> Now if you find from the evidence beyond a reasonable doubt that the said Defendant, William Matthew Schiffert or Aaron Kennedy, did stab Corey McMillan with a deadly weapon . . . but you further find from the evidence, *as viewed from the standpoint of the Defendant* at the time, that from the words or conduct, or both, of Corey McMillan, it reasonably appeared *to the Defendant that his life* or person was in danger and there was created in his mind a reasonable expectation of fear or death or serious bodily injury from the use of unlawful deadly force at the hands of Corey McMillan, and that acting under such apprehension and reasonably believing that *the use of deadly force on his part was immediately necessary to protect himself* against Corey McMillan's use or attempted use of unlawful deadly force, *he stabbed Corey McMillan* with a knife, and that a reasonable person in *the Defendant's* position would not have retreated, then you should acquit the [D]efendant on the grounds of self-defense, or, if you have a reasonable doubt as to whether or not the Defendant was acting in self-defense on the said occasion and under the circumstances, then you should give the Defendant the benefit of the doubt and say by your verdict not guilty. [Emphasis added.]

Appellant did not object to the instruction at trial.

### B. Analysis

Appellant argues that the charge erroneously instructed the jury that it could find Appellant not guilty by reason of self-defense only if it found that *Appellant* stabbed McMillan because he reasonably believed that *his own* life was in danger. Because it is undisputed that Appellant remained in the car

12

while Kennedy confronted and killed McMillan, we agree with Appellant that the charge was erroneous; but we also agree with the State that the error did not cause Appellant egregious harm because no reasonable jury, even if properly instructed, could have found beyond a reasonable doubt that Kennedy killed McMillan in self-defense.

We first consider the entirety of the jury charge itself and the state of the evidence. *See Stuhler*, 218 S.W.3d at 719. The charge properly instructed the jury that an actor's use of deadly force against another in self-defense is justified only when the actor reasonably believes deadly force is immediately necessary to protect the actor or a third person from the other's use or attempted use of deadly force. TEX. PENAL CODE ANN. §§ 9.32 (Vernon Supp. 2007), 9.33 (Vernon 2003). "Deadly force" means force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury. *Id.* § 9.01. The charge also instructed the jury that the use of deadly force is not justified if an actor provokes another's use or attempted use of deadly force by some act or language. *See id.* § 9.31(b)(4).

Brandy Upchurch testified that immediately before the altercation, Appellant telephoned McMillan and said, "I'm looking at your punk bitch now," and that those were "fighting words." Upchurch and GinnyLu Ward both

13

testified that McMillan had nothing in his hands when he came out of the motel room. Upchurch testified that McMillan struck Kennedy with his fist, and Appellant said the same thing in his written statement to police. Considering the state of the evidence, a reasonable jury properly instructed on the issue of self-defense could not have found that Kennedy was justified in using deadly force against McMillan; Appellant provoked the altercation, and even Appellant's and Upchurch's descriptions of the fight show that McMillan did not use or attempt to use deadly force against Kennedy. Thus, Appellant has shown at most theoretical harm, not actual harm, flowing from the erroneous self-defense charge. *See Almanza*, 686 S.W.2d at 174.

We therefore hold that Appellant was not egregiously harmed by the erroneous instruction, and we overrule his fourth point.

## V. Legal Sufficiency

In his second point, Appellant claims that the evidence presented at trial is legally insufficient to support his conviction.

### A. Standard of Review

When reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v.*

14

*Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Burden v. State*, 55 S.W.3d 608, 612 (Tex. Crim. App. 2001). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789. When performing a legal sufficiency review, we may not sit as a thirteenth juror, re-evaluating the weight and credibility of the evidence and, thus, substituting our judgment for that of the fact finder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1131 (2000).

When a jury returns a general verdict and the evidence is sufficient to support a guilty finding under any of the allegations submitted, the verdict will be upheld. *Swearingen v. State*, 101 S.W.3d 89, 95 (Tex. Crim. App. 2003); *Tippitt v. State*, 41 S.W.3d 316, 323 (Tex. App.—Fort Worth 2001, no pet.). Thus, we apply the legal sufficiency standard of review to each theory submitted to the jury in the court's charge. *Rabbani v. State*, 847 S.W.2d 555, 558 (Tex. Crim. App. 1992), *cert. denied*, 509 U.S. 926 (1993); *Tippitt*, 41 S.W.3d at 323.

Sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). This hypothetical

charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.*

## B.    Analysis

Appellant was driving the car when he, Kennedy, and Upchurch arrived at the motel. According to a witness, Appellant seemed to be looking for someone as he drove through the parking lot. Appellant called McMillan from his car and told him, "I'm looking at your punk bitch now." When he saw McMillan, he "gunned" the car. Appellant subsequently parked behind McMillan's car, and then Kennedy jumped out of the car and began stabbing McMillan. The jury could rationally have inferred that Appellant's focus was on McMillan, rather than getting Upchurch's belongings, and that Appellant used what Upchurch conceded were "fighting words" toward McMillan. Moreover, a rational jury could conclude that by parking behind McMillan's car, Appellant wanted to ensure that McMillan did not leave the area.

Given all this evidence, as well as the speed with which Kennedy jumped from Appellant's car and began stabbing McMillan, a rational jury could conclude that Appellant acted with the intent to assist Kennedy in the stabbing of McMillan, and that he solicited, encouraged, directed, aided, or attempted

16

to aid Kennedy in the stabbing of McMillan. Thus, viewing the evidence in the light most favorable to the verdict, we find that a rational jury could have found beyond a reasonable doubt that Appellant was guilty of murder as a party. We overrule the legal sufficiency portion of Appellant's second point.

## VI.     Factual Sufficiency

### A.     Standard of Review

In our original opinion in this appeal, our factual sufficiency review was largely guided by the standard articulated by the court of criminal appeals in *Zuniga v. State*, as follows:

> [T]here are two ways in which the evidence may be insufficient. First, when considered by itself, evidence supporting the verdict may be too weak to support the finding of guilt beyond a reasonable doubt. Second, there may be both evidence supporting the verdict and evidence contrary to the verdict. Weighing all the evidence under this balancing scale, the contrary evidence may be strong enough that the beyond-a-reasonable-doubt standard could not have been met, so the guilty verdict should not stand. This standard acknowledges that evidence of guilt can "preponderate" in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt.

144 S.W.3d 477, 481 (Tex. Crim. App. 2004), *overruled by Watson*, 204 S.W.3d at 417. In *Watson*, the court disavowed and overruled *Zuniga*'s articulation of the standard of review:

> Any holding that a criminal appellate court can reverse and remand for a new trial even when the evidence "preponderates" in favor of

17

a conviction is inconsistent with that historically required high level of skepticism.

> . . . We therefore disavow such language in *Zuniga* and reiterate that it is not enough that the appellate court harbor a subjective level of reasonable doubt to overturn a conviction that is founded on legally sufficient evidence. An appellate court judge cannot conclude that a conviction is "clearly wrong" or "manifestly unjust" simply because, on the quantum of evidence admitted, he would have voted to acquit had he been on the jury. . . . We have always held that an appellate court must first be able to say, with some objective basis in the record, that *the great weight and preponderance* of the (albeit legally sufficient) evidence contradicts the jury's verdict before it is justified in exercising its appellate fact jurisdiction to order a new trial.

*Watson*, 204 S.W.3d at 417. The court restated the standard of review in factual sufficiency cases as follows:

> [F]actual-sufficiency analysis [comprises] two prongs. The first prong asks whether the evidence introduced to support the verdict, though legally sufficient, is nevertheless "so weak" that the jury's verdict seems "clearly wrong and manifestly unjust[.]" The second prong asks whether, considering conflicting evidence, the jury's verdict, though legally sufficient, is nevertheless against the great weight and preponderance of the evidence.

*Id*. at 414–15 (citing *Johnson v. State,* 23 S.W.3d 1, 11 (Tex. Crim. App. 2000)).

To make this determination, we consider all of the evidence in a neutral light, favoring neither party. *Id.* at 414. It is not enough that this court "harbor a subjective level of reasonable doubt to overturn [the] conviction." *Id*. We cannot conclude that a conviction is clearly wrong or manifestly unjust simply

18

because we would have decided differently than the jury or because we disagree with the jury's resolution of a conflict in the evidence. *Id*. We may not simply substitute our judgment for the fact-finder's. *Johnson*, 23 S.W.3d at 12. Unless the record clearly reveals that a different result is appropriate, we must defer to the jury's determination of the weight to be given contradictory testimonial evidence because resolution of the conflict "often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered." *Id.* at 8. Thus, we must give due deference to the fact-finder's determinations, "particularly those determinations concerning the weight and credibility of the evidence." *Id*. at 9.

## B. Analysis

In this appeal, the difference between the standard of review articulated by *Zuniga* and the one articulated by *Watson* compels a different outcome. In our original opinion, we applied the first prong of the *Zuniga* standard and held "all of the evidence in the instant case . . . that could legally support a rational jury's conclusion is nevertheless so weak when viewed in a neutral light that our confidence in the verdict is undermined." *Schiffert*, 207 S.W.3d at 498. But applying the first prong of the *Watson* test*,* we cannot say that "the evidence introduced to support the verdict, though legally sufficient, is nevertheless 'so weak' that the jury's verdict seems *'clearly wrong and*

19

*manifestly unjust*[.]'"  *Watson*, 204 S.W.3d at 414–15 (quoting *Johnson,* 23 S.W.3d at 11) (emphasis added).

The jury heard three versions of the events surrounding McMillan's death: GinnyLu Ward's, Brandy Upchurch's, and—via his written statement—Appellant's.

Ward testified that Appellant drove his car into the Budget Inn parking lot, "acted like they didn't see who they were looking for, and they made a U-turn." While making the turn, "they saw who they were looking for and the driver gunned it," lost control, and hit a red truck.  Appellant then parked his car at an angle behind McMillan's, and the passenger jumped out and began slashing at McMillan.  McMillan said, "What the hell are you doing?" and "Why are you here?" as his assailant slashed at him.  Meanwhile, Appellant looked at Ward and smirked.  The passenger then jumped back into the car, and Appellant sped away.  Ward estimated that the incident lasted "a minute, minute and a half, two tops."  She said she was standing fifteen feet from Appellant's car during the altercation.

Upchurch testified that on the morning of McMillan's death, she moved her belongings out of his motel room and into the next-door neighbor's, where she telephoned Appellant to come and get her.  She walked away from the motel, and Appellant and Kennedy picked her up in a nearby restaurant parking

20

lot. Instead of driving to Appellant's trailer, as Upchurch expected, Appellant, Kennedy, and Upchurch drove back to the motel, ostensibly to retrieve Upchurch's clothes. Appellant drove through the parking lot so that the passenger door would be facing the motel room door, allowing Kennedy — whom McMillan did not know — to jump out and retrieve Upchurch's clothes. As he drove, Appellant placed a cell phone call to McMillan and said, "I'm looking at your punk bitch now." Appellant collided with the red truck, then drove around the parking lot and stopped the car by the door to the motel room where Upchurch had put her clothes. Kennedy jumped out of the car and stood in front of it. McMillan came out of his motel room and tried to open Appellant's car door, but it was locked. Appellant and McMillan argued through the car window, and Kennedy told McMillan to go back inside. McMillan then grabbed and hit Kennedy, and Upchurch saw Kennedy "swinging on him." She said the fight lasted "a minute or two, a couple of seconds, something like that." Kennedy got back in the car, and Appellant drove away. Upchurch admitted that her recollection was "fuzzy" because she "did a lot of drugs back then," "things keep changing within [her] head," and she was confused as to what actually took place. She admitted that she gave police a written statement in which she stated that Appellant tried to get out of the car when McMillan came out of the motel room.

In his written statement to police, Appellant wrote that McMillan came out of the motel, Kennedy "got out of the car as soon as he got in range," McMillan hit Kennedy in the face, and Kennedy "panicked and pulled out a knife and stuck him[.] He dived in the car and we left."

In addition to the three eyewitness accounts, the testimony of the medical examiner is relevant to our analysis. The medical examiner testified that McMillan had no defensive wounds such as cuts or bruises on his arms or hands and there was no indication that he had struck someone recently.

Appellant is guilty, if at all, as a party to McMillan's killing because the undisputed evidence shows that Kennedy actually stabbed the victim. Appellant performed acts that aided Kennedy in the commission of the offense, namely, placing the taunting phone call to McMillan, driving Kennedy "in range" of McMillan, and driving Kennedy away from the scene. The key question, therefore, is whether he performed those acts with the *intent* to promote or assist McMillan's killing. *See* TEX. PENAL CODE ANN. § 7.02(a). Stated in terms of the factual sufficiency standard of review, the question is whether the evidence of Appellant's intent is so weak as to seem "clearly wrong and manifestly unjust." *See Watson*, 204 S.W.3d 414–15.

The evidence that supports the jury's finding that Appellant intended to promote or assist in McMillan's killing is as follows: Instead of driving

22

Upchurch to his trailer as Upchurch expected, he drove back to the motel. He made a loop through the parking lot as though—according to Ward—he was looking for someone he could not find. Appellant then made a taunting phone call to McMillan, which prompted McMillan to leave his motel room. Appellant collided with another vehicle, then parked his car so that Kennedy was "in range," according to Appellant's written statement. According to Ward, Kennedy jumped out of the car and immediately slashed at McMillan; meanwhile, Appellant looked at Ward and smirked. All three eyewitnesses agree that Kennedy then jumped back into the car and Appellant sped away from the scene.

The following evidence tends to support the conclusion that Kennedy killed McMillan on the spur of the moment and weighs against a finding that Appellant intended to promote or assist in McMillan's death: Upchurch testified that Appellant drove her back to the motel to retrieve her clothes and that he drove in a loop through the parking lot to position Kennedy closer to the motel room door so that he could run in and get her bags. Ward and Upchurch estimated that the ensuing altercation lasted as long as two minutes, lending some credence to Upchurch's testimony that something more transpired than Kennedy's leaping out and stabbing McMillan as soon as the car stopped.

23

Appellant and Upchurch both asserted that Kennedy stabbed McMillan only after McMillan struck him.

But other evidence contradicts the notion that McMillan initiated a struggle that culminated in his death. First, Appellant's taunting phone call to McMillan contradicts Upchurch's testimony that the plan was for Kennedy—who was unknown to McMillan—to dash into the motel room and retrieve her bags. Second, the medical examiner's testimony that McMillan's corpse had no defensive wounds and showed no signs of having struck someone recently contradicts the possibility of a prolonged struggle and Appellant's and Upchurch's claim that McMillan hit Kennedy first. Finally, Upchurch's testimony that she was confused about what happened and "fuzzy" from drug use diminishes the impact of her other testimony.

In his petition for discretionary review, Appellant points to other evidence that he contends renders the verdict manifestly unjust. Upchurch testified that her relationship with McMillan was violent, that he had coerced her with threats into returning to the motel after he found her living in Appellant's trailer, and that he had said that he "had a bullet" for Appellant. A friend of McMillan's testified that she had seen McMillan shove Upchurch on one occasion and lift

24

her by the throat on another occasion.[5]  Ward testified that she saw McMillan arguing with and shoving a white female in front of the Budget Inn fifteen to twenty minutes before the stabbing.  McMillan was older, larger, and heavier than Kennedy.  This is some evidence that McMillan had a propensity for violence, but does not prove that he started the fight that resulted in his death; nor is it so strong as to render the jury's verdict clearly wrong or manifestly unjust.  *See Watson*, 204 S.W.3d at 414–15.

A jury is responsible for resolving the conflicts in the evidence.  *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944 (2001).  Further, a jury may believe some, all, or none of a witness's testimony.  *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).  Here, the jury resolved the conflicts in the evidence against Appellant.  Considering all of the evidence in a neutral light, we cannot say that it is so weak that the jury's verdict seems clearly wrong and manifestly unjust or, considering conflicting evidence, the jury's verdict is against the great weight and preponderance of the evidence.  Therefore, the evidence is factually sufficient to support the jury's verdict.  *See Watson,* 204 S.W.3d 414–15.

---

[5] Appellant's representation that the witness testified that "*on many occasions* she was witness to McMillan hitting Upchurch and lifting her up by the throat" is not supported by the record. [Emphasis added.]

25

In our original opinion, we analyzed in detail the evidence recounted in the court of criminal appeals's opinion in *Vodochodsky v. State,* 158 S.W.3d 502, 511 (Tex. Crim. App. 2005) (op. on reh'g). In that case, the court reversed for factual insufficiency Vodochodsky's conviction as a party to the slaying of three peace officers. *Id.* The court decided *Vodochodsky* between its decisions in *Zuniga* and *Watson*, but it did not cite *Zuniga* when articulating the applicable standard of review. *See id.* at 510. The court cited *Johnson* for the proposition that a court must "set aside the verdict if 'proof of guilt is so obviously weak as to undermine confidence in the jury's determination . . . .'" *Id.* (quoting *Johnson*, 23 S.W.3d at 11). Under *Watson's* re-articulation of the factual sufficiency test, a court is authorized to set aside a verdict only if "the evidence introduced to support the verdict, though legally sufficient, is nevertheless 'so weak' that the jury's verdict seems 'clearly wrong and manifestly unjust[.]'" *Watson*, 204 S.W.3d at 414–15 (quoting *Johnson,* 23 S.W.3d at 11). Though the court quoted *Johnson* in both *Vodochodsky* and *Watson*, its emphasis in the latter case on *Johnson's* "clearly wrong and manifestly unjust" language instead of its "undermine confidence in the jury's determination" language calls into doubt the standard applied in *Vodochodsky*. Therefore, we decline to apply the standard of review or reasoning articulated in *Vodochodsky* and instead apply the standard of review articulated in *Watson.*

26

We hold that the evidence is factually sufficient to support the jury's verdict that Appellant, acting with intent to promote or assist Kennedy in the stabbing death of McMillan, solicited, encouraged, directed, aided, or attempted to aid Kennedy in the stabbing death of McMillan. We overrule the remainder of Appellant's second point.

## VII.    Ineffective Assistance

In his third point, Appellant agues his trial counsel rendered ineffective assistance by failing to object to errors in the charge, by failing to request an instruction on independent impulse and extraneous offenses, and by failing to object to testimony that Appellant was "on parole."

### A.    Standard of review

To establish ineffective assistance of counsel, appellant must show by a preponderance of the evidence that his counsel's representation fell below the standard of prevailing professional norms and that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005); *Mallett v. State*, 65 S.W.3d 59, 62–63 (Tex. Crim. App. 2001); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999).

27

When evaluating the effectiveness of counsel under the first prong, we look to the totality of the representation and the particular circumstances of each case. *Thompson*, 9 S.W.3d at 813. The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065. Review of counsel's representation is highly deferential, and the reviewing court indulges a strong presumption that counsel's conduct fell within a wide range of reasonable representation. *Salinas*, 163 S.W.3d at 740; *Mallett*, 65 S.W.3d at 63. To overcome the presumption of reasonable professional assistance, "any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Id.* (quoting *Thompson*, 9 S.W.3d at 813). In the absence of direct evidence of counsel's reasons for the challenged conduct, we will assume a strategic motivation if any can be imagined. *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001), *cert. denied*, 537 U.S. 1195 (2003). A full inquiry into the strategy or tactics of counsel should be made only if, from all appearances after trial, there is no plausible basis in strategy or tactics for counsel's actions. *See Johnson v. State*, 614 S.W.2d 148, 152 (Tex. Crim. App. [Panel Op.] 1981); *Ex parte*

28

*Burns*, 601 S.W.2d 370, 372 (Tex. Crim. App. 1980); *Stenson v. State*, 695 S.W.2d 569, 571 (Tex. App.—Dallas 1984, no pet.).

The second prong of *Strickland* requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial, i.e., a trial whose result is reliable. *Strickland,* 466 U.S. at 687, 104 S. Ct. at 2064. In other words, appellant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S. Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* The ultimate focus of our inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. *Id.* at 697, 104 S. Ct. at 2070.

A reviewing court will rarely be in a position on direct appeal to fairly evaluate the merits of an ineffective assistance claim. *Thompson*, 9 S.W.3d at 813–14. "In the majority of cases, the record on direct appeal is undeveloped and cannot adequately reflect the motives behind trial counsel's actions." *Salinas*, 163 S.W.3d at 740 (quoting *Mallett*, 65 S.W.3d at 63). Often, ineffective assistance claims are better raised within the framework of a post-conviction writ of habeas corpus under article 11.07 of the code of criminal procedure. TEX. CODE CRIM. PROC. ANN. art. 11.07 (Vernon Supp. 2007); *see Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003) ("[T]he record

29

on direct appeal will generally 'not be sufficient to show that counsel's representation was so deficient as to meet the first part of the *Strickland* standard' as '[t]he reasonableness of counsel's choices often involves facts that do not appear in the appellate record.'"); *see also Bone v. State*, 77 S.W.3d 828, 837 n.30 (Tex. Crim. App. 2002) ("This resolution in no way affects appellant's entitlement to re-urge this or other appropriate constitutional complaints on a writ of habeas corpus.").

**B.    Analysis**

First, Appellant argues counsel was ineffective by failing to object to the charge errors made the basis of his first and fourth points and discussed above. The *Almanza* standard for egregious harm—charge error that deprived the defendant of a fair trial—is essentially the same as the second prong of *Strickland*—counsel's error that deprived the defendant of a fair trial. *Almanza*, 686 S.W.2d at 171; *Strickland,* 466 U.S. at 687, 104 S. Ct. at 2064. Having already determined that the charge errors did not deprive Appellant of a fair trial, we now hold that Appellant has failed to show that counsel's failure to object to those same charge errors deprived him of a fair trial.

Next, Appellant argues counsel was ineffective by failing to request a charge instruction on independent impulse. There is no enumerated defense of "independent impulse" in the penal code, and a trial court does not err by

refusing to give such an instruction. *Solomon v. State*, 49 S.W.3d 356, 368 (Tex. Crim. App. 2001). Therefore, Appellant cannot show that but for counsel's failure to request an independent impulse instruction, the jury would have reached a different verdict.

Appellant also contends that counsel was ineffective by failing to request a specific application of the acts relied on by the State to prove the "solicit, encourage, direct, aid, or attempt to aid" element of party liability. Appellant relies on *Johnson v. State* to support this contention. 739 S.W.2d 299, 305 (Tex. Crim. App. 1987). In *Johnson*, the court of criminal appeals held that the trial court reversibly erred when it failed to explicitly apply the law of parties to the facts of the case upon the defendant's timely objection that the charge failed "to allege the specific acts that the State is relying on to make [the defendant] a party. It does not say depending on solicitation, encouragement, direction, aid[,] or attempt to aid [the principal] in the commission of this offense." *Id.* at 300, 305. The court explained that "explicitly apply the law of parties to the facts" means that a charge should inform the jury which specific mode or modes of conduct enumerated in penal code section 7.02(a)(2), "solicited, encouraged, directed, aided, or attempted to aid," formed the basis for conviction as a party. *Id.* at 305 n.4.

31

In this case, the charge recited all of the modes enumerated in section 7.02(a)(2); this was sufficient to comply with *Johnson*. *Johnson* does not require recitation of the specific acts relied on by the State to prove one or more of those modes. Thus, Appellant has failed to show a reasonable probability that but for his failure to request such a recitation, the result of the proceeding would have been different.

Next, Appellant argues counsel was ineffective by (1) failing to object to Brandy Upchurch's unsolicited comment that Appellant wanted to get out of town after the killing "because he was on parole" and (2) failing to request a jury charge on extraneous offenses to mitigate the "on parole" statement. The record is silent as to why counsel did not object to Upchurch's statement or request an extraneous offense instruction, but as the State points out, he could have been motivated by sound trial strategy, namely, to avoid emphasizing or calling the jury's attention to Upchurch's statement. Thus, in this instance, Appellant has failed to satisfy the first half of the *Strickland* test. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Garcia*, 57 S.W.3d at 440.

Finally, Appellant contends counsel was ineffective by failing to object to the charge's application paragraph that allowed the jury to convict Appellant as the principal actor in McMillan's killing. We cannot see how the inclusion of

32

this language in the charge deprived Appellant of a fair trial.  The undisputed evidence showed that Appellant remained in the car while Kennedy stabbed McMillan; thus, Appellant could only be guilty as a party, and the possibility that the jury could have convicted Appellant as the principal is far fetched. Thus, once again, Appellant has failed to show that but for counsel's alleged unprofessional conduct, the jury would have returned a different verdict.

Having determined that Appellant failed to establish at least one of the *Strickland* prongs with regard to each of counsel's alleged errors, we overrule his third point.

## VIII.  Conclusion

Having overruled all of Appellant's points, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL A:   CAYCE, C.J.; LIVINGSTON and GARDNER, JJ.

PUBLISH

DELIVERED: March 20, 2008

33