

# NUMBER 13-08-00228-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

| | |
|---|---|
| **GUILLERMO PANIAGUA PANIAGUA,** | **Appellant,** |
| **v.** | |
| **THE STATE OF TEXAS,** | **Appellee.** |

## On appeal from the 329th District Court
## of Wharton County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Garza
Memorandum Opinion by Chief Justice Valdez**

A jury found appellant, Guillermo Paniagua Paniagua, guilty of felony murder, a first-degree felony. *See* TEX. PENAL CODE ANN. §§ 19.02(b)(3), (c) (Vernon 2003), 49.09(b)(2) (Vernon Supp. 2009). The jury assessed punishment at ninety years' imprisonment and a fine of $10,000. Paniagua raises the following issues on appeal: (1) the trial court erred by denying his motion to suppress statements made to law enforcement officers because he did not knowingly, intelligently, or voluntarily waive his rights; (2) trial counsel was

ineffective for failing to request an application paragraph on causation in the jury charge; and (3) the evidence is legally and factually insufficient to support his conviction. We affirm.

## I. BACKGROUND

On January 19, 2007, at around 9:00 p.m., Taylor Ivy drove through the cold, misty rain down FM 1301, a two-lane farm road connecting Boling to Wharton, Texas. A police cruiser, driven by Chief Ernest Mendoza, passed Ivy and then re-entered the lane. Approximately thirty seconds later, Ivy saw Mendoza's taillights "go into the air and come back down," indicating that a collision had occurred. Upon reaching the collision, Ivy saw Medoza's car "kind of in the dead center of the road" and a pick-up truck, later identified as Paniagua's, "more or less on the shoulder" of Mendoza's lane. Ivy pulled over, called 911, and checked Mendoza's condition but was unable to find a pulse. An autopsy report later revealed that Mendoza's cause of death was blunt force trauma.

John Loop, a passenger in Ivy's car, testified that Paniagua's truck "smelled of alcohol" and that when Paniagua emerged from the driver's side of the truck he appeared confused. Loop testified that he turned his attention to Mendoza and "lost track" of Paniagua.

Later that night, Chad Allen, a motorist traveling on a different road and unaware of the earlier collision, was waved down by Paniagua. Allen testified that Paniagua told him that his truck had been stolen and that he needed a ride. Paniagua rode in the bed of Allen's truck to a nearby gas station. Around midnight, Jerry Price, a Wharton County Deputy Sheriff involved in the search for Paniagua, saw a man exit the bed of a truck at a closed gas station. After identifying the man as Paniagua, Deputy Price placed him under arrest, drove him to the scene of the collision, and released him to Texas

2

Department of Public Safety ("DPS") officers.

DPS Trooper Daniel Terronez testified that when he arrived at the scene of the collision at 9:34 p.m., Paniagua was not present. Trooper Terronez and Trooper Todd Respondek began an investigation. Trooper Terronez testified that the front passenger sides of both vehicles sustained massive damage and that "gouge marks" were found in Mendoza's lane.[1] Based on his experience and training in reconstruction, the position of the gouge marks, and the positions of the vehicles, Trooper Terronez opined that the collision occurred in Mendoza's lane. Trooper Terronez further testified that in his opinion, Paniagua crossed the center stripe, drove onto the shoulder of Mendoza's lane and off the edge of the pavement, then "over corrected or tried to get back up on the road," and that the passenger side of Paniagua's truck was then struck by the passenger side of Mendoza's car.

Trooper Respondek testified that Mendoza suffered death as a result of the collision and that the manner in which Paniagua was driving his truck made it capable of causing death. Trooper Respondek opined that the gouge marks indicated the point of impact and that at the point of impact, Mendoza's car was pressed down onto the asphalt under the weight of Paniagua's truck. The defense refuted the State's description of the collision by presenting testimony from Michael James, Ph. D., an accident reconstructionist. Dr. James testified that, at the time of impact, Mendoza was traveling at least seventy miles per hour and "each of the vehicles w[as] in the wrong lane."

Trooper Respondek testified that Paniagua had bloodshot eyes and "an odor of alcoholic beverage on him," and that a twelve-pack of beer was found in the cab of his

---

[1] Trooper Terronez testified that "gouge marks" are indentations in the asphalt of a roadway and that "[a] downward force or something has to fall off a vehicle or something has to be forced into the roadway to cause a [gouge] mark." Additionally, he testified that gouge marks often indicate the "point of impact."

truck. Trooper Respondek took Paniagua to Gulf Coast Medical Center, and a blood test revealed that at 12:50 a.m., Paniagua's blood alcohol content was .18, more than twice the legal limit. The State presented retrograde extrapolation testimony that Paniagua's blood alcohol content at the time of the collision was approximately .24, three times the legal limit.

A jury convicted Paniagua of felony murder and assessed punishment at ninety years' imprisonment and a $10,000 fine. This appeal ensued.

## II. Legal and Factual Sufficiency

In his third issue, Paniagua contends that the evidence is legally and factually insufficient to support his conviction.

### A. Standards of Review

When reviewing the legal sufficiency of the evidence, we examine all of the evidence in the light most favorable to the judgment to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). A jury's verdict will be upheld "unless a rational fact[-]finder [would] have had reasonable doubt as to any essential element." *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (quoting *Jackson*, 443 U.S. at 318-19). Although we review all of the evidence presented at trial, we do not re-weigh the evidence or substitute our judgment for that of the fact-finder. *Utomi v. State*, 243 S.W.3d 75, 78 (Tex. App.–Houston [1st Dist.] 2007, pet. ref'd) (citing *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). Inconsistencies in the evidence are resolved in favor of the judgment. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

4

In conducting a factual sufficiency review, we are "cognizant of the fact that a jury has already passed on the facts"; therefore, we "must give due deference to the determinations of the jury." *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We review the evidence in a neutral light to determine whether "the evidence supporting the verdict is so weak as to render the verdict clearly wrong or manifestly unjust." *Id.* We will not reverse the jury's verdict unless we can say with some objective basis in the record that the great weight and preponderance of the evidence contradicts the verdict. *Watson v. State*, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006).

## B. Applicable Law

Both legal and factual sufficiency are measured by the elements of the crime as defined by the hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd). Under a hypothetically correct jury charge, Paniagua committed the charged offense if he committed or attempted to commit a felony other than manslaughter and, in the course of and in furtherance of the commission or attempt, he committed or attempted to commit an act clearly dangerous to human life that causes the death of an individual. *See* TEX. PENAL CODE ANN. § 19.02(b)(3). "A person commits [the offense of driving while intoxicated] if the person is intoxicated while operating a motor vehicle in a public place." *Id.* § 49.04(a) (Vernon 2003). "Intoxicated" is defined as "not having the normal use of mental or physical faculties by reason of the introduction of alcohol . . . into the body" or "having an alcohol concentration of 0.08 or more." *Id.* § 49.01(2) (Vernon 2003). The offense of driving while intoxicated is a felony if the person has previously been convicted at least twice for driving while intoxicated. *See id.* § 49.09(b)(2).

5

**C.      Analysis**

The State presented evidence that gouge marks were found in Mendoza's lane. Trooper Terronez testified that he is trained in accident reconstruction and that, in his opinion, Paniagua crossed the center line and caused the collision.  Trooper Terronez stated that the gouge marks were "fresh"[2] and that the position and freshness of the marks, as well as the positions of the vehicles, indicated that the collision occurred in Mendoza's lane.  Trooper Terronez opined that, based on his investigation, Paniagua crossed the center line.  Trooper Respondek also testified that the impact occurred at the position of the gouge marks.  Trooper Respondek noted that the gouge marks were surrounded by a debris field and that this indicated that Paniagua's truck struck Mendoza's car in Mendoza's lane approximately four feet from the center line. Trooper Respondek testified that the manner in which Paniagua had driven his truck that night made it capable of causing death and that Mendoza's death was a result of the collision.  Blood tests revealed that at approximately 12:50 a.m. Paniagua's blood alcohol level was approximately two times the legal limit, and the State's retrograde extrapolation expert testified that Paniagua's blood alcohol level was three times the legal limit at the time of the collision. The State also presented evidence that soon after the collision, Paniagua's eyes were bloodshot and he smelled of alcohol.  Additionally, the defense stipulated to the admissibility of two prior judgments of conviction for driving while intoxicated.

The State did not present any eyewitness testimony that Paniagua crossed the center line. Ivy and Long, occupants of a car traveling two hundred yards behind Mendoza testified that Mendoza passed them approximately thirty seconds before the collision.

---

[2] Trooper Terronez testified that "fresh" gouge marks are gouge marks recently created and that the marks were "fresh" because they did not contain dirt, sediment, or oil.

Although Ivy testified that Mendoza did not "fly by" as he passed, Long testified that Mendoza was driving eighty to eighty-five miles-per-hour when he passed. Dr. James, Paniagua's accident reconstructionist, testified that just before the collision both Mendoza and Paniagua were in the wrong lanes; however, Dr. James was unable to identify which vehicle was the first to cross the center line. Dr. James also stated that the gouge marks do not indicate the point of impact of the vehicles. Dr. James opined that when the collision occurred, the vehicles overlapped and, when the vehicles separated, Paniagua's truck came down with enough force to cause the gouge marks. Additionally, data recorders indicating the speed changes of the vehicles moments before the collision were not analyzed.

Viewing the evidence in the light most favorable to the verdict, and giving due deference to the jury, *see Lancon*, 253 S.W.3d at 405, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Paniagua committed a felony by driving while intoxicated while having two prior driving while intoxicated convictions and that he committed an act clearly dangerous to human life that caused Mendoza's death. *See Laster*, 275 S.W.3d at 518. Viewing the evidence in a neutral light, we cannot conclude that the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust or that the jury's verdict is against the great weight and preponderance of the evidence. *Watson*, 204 S.W.3d at 414-15. We conclude that the evidence is legally and factually sufficient to support Paniagua's conviction. We overrule Paniagua's third issue.

### III. MOTION TO SUPPRESS

Paniagua contends that the trial court erred by denying his request to suppress oral

7

statements made after his arrest.[3] The oral statements of which Paniagua complains were used by the State's expert witness in conducting a retrograde extrapolation to determine Paniagua's blood alcohol content at the time of the collision.[4] Specifically, Paniagua argues that statements obtained during interrogation at Gulf Cost Medical Center shortly after his arrest, as well as statements made during a later interrogation at the Wharton County Jail, were obtained in violation of article 38.22 of the code of criminal procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 (Vernon 2005).

## A.    Standard of Review

A trial court's denial of a motion to suppress is reviewed for an abuse of discretion. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We review the evidence in the light most favorable to the trial court's ruling, *see Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007), and review the trial court's ruling under a bifurcated standard of review, giving almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *See Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007). However, when application-of-law-to-fact questions do not turn

---

[3] Neither party requested, and the trial court did not initially enter findings of fact or conclusions of law. Article 38.22, section 6 of the code of criminal procedure imposes a mandatory duty on the trial court to file written findings of fact and conclusions of law when the voluntariness of a statement is challenged. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6 (Vernon 2005); *see also State v. Aguilar*, No. PD-059-09, 2009 WL 636534, at *1 (Tex. Crim. App. March 11, 2009) (per curiam) (not designated for publication) (citing *Urias v. State*, 155 S.W.3d 141, 142 (Tex. Crim. App. 2004)). Accordingly, we abated this proceeding and remanded to the trial court for compliance. After receiving the trial court's findings of fact and conclusions of law as to the voluntariness of the challenged statements, this cause was reinstated and both parties filed post-submission briefs on the issue of voluntariness.

[4] Paniagua argues that his answers to questions regarding "what time he ate, what he ate[,] how much he had to drink, when he drank, how long since his last drink[,] and what time he started drinking" should not have been used to conduct retrograde extrapolation because they were obtained in violation of article 38.22. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22.

8

on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de novo. *See id.*; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005).

**B.    Analysis**

Section 3 of the Texas Code of Criminal Procedure requires, inter alia, that "prior to the statement but during the recording the accused is given the [warnings as required by section 2(a)]" and "knowingly, intelligently, and voluntarily" waives those rights.[5]  *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3.  Both sides agree that the warnings were given; however, Paniagua argues that he did not "knowingly, intelligently, and voluntarily" waive his rights because he was not specifically asked to waive, nor did he expressly waive his rights.  Additionally, Paniagua contends that he was too intoxicated at the hospital to fully understand and waive his rights.

In the present case, officers read Paniagua his rights in both English and Spanish and asked if he understood them before questioning him.  The trial court entered findings of fact regarding Paniagua's understanding of his rights, including:

> 1)    The court finds that defendant speaks sufficient English to understand the warnings required by Texas Code of Criminal Procedure Article 38.22 and also speaks fluent Spanish.

---

[5] The section 2(a) warning requires the defendant be advised (1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial, (2) any statement he makes may be used as evidence against him in court, (3) he has the right to have a lawyer present to advise him prior to and during any questioning, (4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning, and (5) he has the right to terminate the interview at any time.  *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(a) (Vernon 2005).  The section 2(a) warning is virtually identical to the *Miranda* warning, *see Miranda v. Arizona*, 384 U.S. 436 (1966), with one exception—the admonition that an accused has the right to terminate the interview at any time.  *See Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007).

2) The warnings as to defendant's right to remain silent, that any statement he made may be used as evidence against him in court, to have a lawyer present to advise him prior to and during any questioning, if he was unable to employ a lawyer, he had the right to have a lawyer appointed to advise him prior to and during any questioning, and to terminate the interview at any time were provided to the defendant in Spanish prior to the relevant interviews being conducted.

. . . .

8) The court finds that . . . no reasonable person could have failed to understand the warnings given to the defendant prior to the instigation of each of the two interviews at issue in this cause.

9) The court finds that the defendant did understand the warnings referenced in finding #2 prior to agreeing to speak with agents of the State in each of the two instances.

. . . .

17) The court finds that defendant's actions and words, indicating that he understood his rights, demonstrates that he fully understood those rights . . . .

The court's findings are supported by the record. At the hearing on Paniagua's motion to suppress, Trooper Respondek testified that Paniagua nodded his head in the affirmative after being read his rights in Spanish and asked if he understood. The trial court also viewed a video showing Paniagua nod in the affirmative after his rights were read in Spanish. Trooper Terronez testified that when he questioned Paniagua at the jail later that day, he provided Paniagua with his article 38.22 warnings written in English and played a Spanish recording that read each of the warnings. Following the Spanish translation, Paniagua stated that he understood his rights and signed his name at the

bottom of a page that listed the warnings in English.

In order to comply with article 38.22, in addition to understanding his rights, a defendant must voluntarily waive them in order for a statement to be admissible against him. *See id.* It is well-established that section 38.22 does not require an express waiver. *See Barefield v. State*, 784 S.W.2d 38, 40 (Tex. Crim. App. 1989), *overruled on other grounds by Zimmerman v. State*, 860 S.W.2d 89, 94 (Tex. Crim. App. 1993). In *Barefield*, a defendant's oral confession was admitted at trial. *Id.* On appeal, the defendant argued that because he was not asked whether he waived his rights prior to his confession, nor did he expressly waive his rights, his confession should be suppressed. *Id.* The Texas Court of Criminal Appeals held that the oral confession statute does not require an express verbal waiver and that a waiver of rights may be inferred from the "totality of the circumstances." *Id.* at 40-41. A defendant's statement is knowingly, intelligently, and voluntarily made if a defendant is read his rights, indicates he understands them, and proceeds without hesitation to discuss the offense. *See Turner v. State*, 252 S.W.3d 571, 583 (Tex. App.–Houston [14th Dist.] 2008, pet. ref'd); *Hargrove v. State*, 162 S.W.3d 313, 319 (Tex. App.–Fort Worth 2005, pet. ref'd).

As previously discussed, Paniagua was read his rights and indicated that he understood them. The trial court found that Paniagua "freely chose to waive [his rights] when he voluntarily responded to the officers' questions." Although Paniagua never made an explicit waiver of his rights, it is clear from the record that his statement was made voluntarily. *See Hargrove,* 162 S.W.3d at 318-19 (finding that appellant implicitly waived his rights where he was read his rights, indicated that he understood his rights, and proceeded to discuss the offense); *State v. Oliver*, 29 S.W.3d 190, 193 (Tex. App.–San

11

Antonio 2000, pet. ref'd) (same). Both at the hospital and later at the jail, after indicating that he understood his rights, Paniagua proceeded without hesitation to answer questions about his actions on the day in question. Furthermore, nothing in either videotaped statement indicates that Paniagua did not knowingly, intelligently, and voluntarily waive his rights. *See Hargrove*, 162 S.W.3d at 318-19.

Based on the totality of the circumstances, we conclude that, at both the hospital and the Wharton County jail, Paniagua knowingly, intelligently, and voluntarily waived his rights as required by article 38.22. *See id.* Accordingly, we conclude that the trial court did not err by denying Paniagua's motion to suppress. Paniagua's first issue is overruled.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

In his second issue, Paniagua contends that he received ineffective assistance of counsel because his trial counsel failed to request an application paragraph on the issue of causation.

### A. Applicable Law

Although the constitutional right to counsel ensures the right to reasonably effective counsel, it does not guarantee errorless counsel whose competency or accuracy of representation is to be judged by hindsight. *Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003). To prove ineffective assistance of counsel, Paniagua must show that (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's error, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008); *Jaynes v. State*, 216 S.W.3d 839, 851 (Tex. App.–Corpus Christi 2006, no pet.). A failure to make a showing under either prong of the

12

*Strickland* standard defeats a claim of ineffective assistance of counsel. *Rylander*, 101 S.W.3d at 110-11.

Paniagua must prove his claim of ineffective assistance of counsel by a preponderance of the evidence. *See Stafford v. State*, 813 S.W.2d 503, 506 n.1 (Tex. Crim. App. 1991). Our review of defense counsel's representation is highly deferential, and we presume that counsel's actions fell within the wide range of reasonable and professional assistance. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002).

**B.     Analysis**

Paniagua argues that counsel's assistance was ineffective because the jury was not given an application paragraph on the issue of causation and, therefore, the jury was "unduly influenced by [Paniagua's] prior record for D.W.I., [and] his blood alcohol concentration at the date and time of the accident" and "less concern[ed]" with whether Mendoza or Paniagua "actually caused the collision." Paniagua contends that the jury charge was defective because it failed to apply the law to the facts for the jury's benefit. Paniagua relies on *Degrate v. State* in support of this contention. 86 S.W.3d 751 (Tex. App.–Waco 2002, pet. ref'd). *Degrate* is a manslaughter case in which the defendant set forth the defensive theory that the victims caused their own deaths by failing to stop at a stop sign and by failing to wear their seatbelts. *Id.* at 752. The jury charge in *Degrate*, as in the present case, contained a correct instruction on causation; however, in *Degrate*, the application paragraph made no reference to it. *Id.* at 753. Ineffective assistance of counsel was not at issue in *Degrate*; instead, *Degrate* focused only on whether the trial court erred by failing to instruct the jury on causation. *Id.* at 752. The *Degrate* court

concluded that the application paragraph was defective because it failed to refer to the instruction on causation; however, the court found that such error did not cause the defendant to suffer egregious harm *Id.* at 753. Accordingly, we conclude that the jury charge in the present case was defective.[6]

A defective jury charge does not necessarily support a claim of ineffective assistance of counsel. *See Stewart v. State*, 293 S.W.3d 853, 863-64 (Tex. App.–Texarkana 2009, pet. filed) (concluding that defense counsel's failure to object to an erroneous charge was not ineffective assistance). When evaluating the effectiveness of counsel under the first prong of *Strickland*, we look to the totality of the representation and the particular circumstances of each case. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). The only complaint that Paniagua makes regarding trial counsel's performance is that counsel failed to request that an application paragraph regarding causation be placed in the jury charge. At the hearing on Paniagua's motion for new trial, the court admitted trial counsel's signed and sworn affidavit stating, "My failure to request an application paragraph was not a conscious decision and was not part of my trial strategy. . . . " Assuming, arguendo, that counsel's performance fell below an objective standard of reasonableness, Paniagua must nonetheless satisfy the second prong of *Strickland*. *See Strickland*, 466 U.S. at 687; *Jaynes*, 216 S.W.3d at 851.

Under *Strickland's* second prong, Paniagua must prove that there is a reasonable probability that, but for counsel's error, the result of the trial would have been different. *See Strickland*, 466 U.S. at 687. In order to meet the second prong of *Strickland*, Paniagua must prove that the complained of charge error deprived him of a fair trial. *See*

---

[6] Paniagua has not raised jury charge error as a separate issue on appeal.

*Schiffert v. State*, 257 S.W.3d 6, 21-22 (Tex. App.–Fort Worth 2008, pet. dism'd) (holding that where charge errors did not deprive appellant of a fair trial, counsel's failure to object to those errors was not ineffective). "The *Almanza* standard for egregious harm—charge error that deprived the defendant of a fair trial—is essentially the same as the second prong of *Strickland*—counsel's error that deprived the defendant of a fair trial." *Id.* at 21.

Although the application paragraph of the jury charge made no reference to Paniagua's defensive theory of causation, the jury charge provided the following instruction on causation:

> A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient.

Additionally, although there was no direct eyewitness testimony as to which vehicle crossed the center line and caused the collision, the jury heard evidence that gouge marks were found in Mendoza's lane. Trooper Terronez opined that based on his training in reconstruction, the position of the gouge marks, and the positions of the vehicles, the collision was the result of Paniagua crossing into Mendoza's lane. The State also presented testimony that Paniagua smelled of alcohol and that his eyes were bloodshot. Blood testing revealed that Paniagua's blood alcohol content was over two times the legal limit hours after the collision, and retrograde extrapolation testimony revealed that Paniagua's blood alcohol level was three times the legal limit at the time of the collision. Although Paniagua's accident reconstructionist expert testified that Mendoza's car was in Paniagua's lane at the time of the collision, he further testified that Paniagua's vehicle was in Mendoza's lane just before the impact. Moreover, Paniagua's accident reconstructionist

15

stated, "I cannot tell you more likely than not who crossed into the wrong lane first."

Based on the foregoing, Paniagua has failed to prove by a preponderance of the evidence that but for counsel's alleged unprofessional conduct, the jury would have returned a different verdict. *See id.* We, therefore, cannot conclude that trial counsel's failure to request an application paragraph on the issue of causation deprived Paniagua of a fair trial. Accordingly, Paniagua's second issue is overruled.

## V. Conclusion

Having overruled all of Paniagua's issues, we affirm the trial court's judgment.

_____
ROGELIO VALDEZ
Chief Justice

Do not publish.
Tex. R. App. P. 47.2(b)
Delivered and filed the
25th day of February, 2010.