**Opinion filed February 27, 2026**



In The

# Eleventh Court of Appeals

_____

## No. 11-24-00234-CR
_____

### JAKE ERIN TAYLOR, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 32nd District Court**
**Mitchell County, Texas**
**Trial Court Cause No. 8478**

## M E M O R A N D U M   O P I N I O N

A jury found Appellant, Jake Erin Taylor, guilty of murder and assessed his punishment at imprisonment for seventy years in the Institutional Division of the Texas Department of Criminal Justice (TDCJ) and a $10,000 fine. *See* TEX. PENAL CODE ANN. § 12.32 (West 2019), § 19.02(b)(2) (West Supp. 2025). The trial court sentenced Appellant accordingly.

In his sole issue on appeal, Appellant challenges the sufficiency of the evidence to support the jury's rejection of his claim of self-defense. We affirm.

## I. *Factual Background*

On the morning of August 8, 2023, Michael Seth Molina and Christy Vanderslice were at the home of an acquaintance, Kimberly Bynum. Appellant arrived at Bynum's residence between 7:00 a.m. and 8:00 a.m., and Appellant and Molina "talked." At some point, Appellant's and Molina's conversation escalated into a physical altercation, which resulted in Appellant stabbing Molina with a knife. Appellant then fled the scene. Thereafter, emergency services arrived and rendered aid to Molina, but Molina died from complications associated with the stabbing. Law enforcement officers later located Appellant in his aunt's apartment across town and arrested him.

Police Chief Joseph Stephens with the Colorado City Police Department testified to the circumstances of Appellant's arrest and he stated that he observed Appellant "limping" at that time. Chief Stephens, Officer Kimberly Curran with the Colorado City Police Department, and Texas Ranger Philip Vandygriff interviewed Appellant after his arrest.[1] Ranger Vandygriff described Appellant's demeanor during the interview as "pretty matter of fact." He additionally noted that Appellant (1) limped into the interview room, (2) had a swollen ankle, and (3) had minor injuries to his head. Officer Curran also observed injuries to Appellant's ankle.

In his recorded interview with law enforcement, Appellant stated that he knew Molina wanted to fight him because of Appellant's rejection of Molina's "advances." Appellant also said that Molina sent threatening messages to his workplace, and that he "tr[ied] to avoid [Molina]" because of this. As for the

---

[1]Appellant was *Mirandized* prior to his interview. *See Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966).

circumstances of the altercation, Appellant recalled that Vanderslice was in the living room when he arrived, and he stated that he was unaware that Molina was at Bynum's residence at the time. Shortly after Appellant entered Bynum's residence, Molina "walk[ed] around the corner" and said, "what's up." According to Appellant, the altercation began when he told Molina to "back up" during their conversation. At some point, Molina pushed him.

Appellant recounted that they fought in the living room near the front door, and that the front door was closed. Appellant further stated that he "got in a few good hits" before he lost his footing and fell near the front door; he believed that he was defenseless after he fell. Appellant said that (1) he attempted to swing his knife at Molina's legs, (2) Molina "stomped" on his ankle, (3) he "blacked out" while Molina was hitting him, (4) "all bets were off" after he blacked out, and (5) he "got back up" and stabbed Molina before he could "punch [Appellant] again." Appellant also admitted that he had sharpened the serrations on the back side of his knife.

Appellant panicked after the altercation and called his mother after he fled. Appellant admitted that he tried to hide at a friend's house, Claylene Meyer, while he waited for his mother to pick him up, but Meyer "kicked him out" of the house. Appellant made several inconsistent statements to law enforcement during the interview regarding where he disposed of his knife after he fled, namely that: (1) he disposed of the knife in a dumpster at Dollar General; (2) he threw the knife in an open field behind Meyer's house; and (3) after law enforcement told Appellant that they were in possession of the knife, Appellant admitted that he gave Meyer the knife and she "g[o]t rid of it" "on her own." When law enforcement asked Appellant if he needed medical attention, Appellant responded that he "want[ed] to go to bed." Francisco Atkinson, jail administrator with the Mitchell County Sheriff's Office, testified that Appellant received medical treatment on August 10.

A jail telephone call between Appellant and his mother, where he discussed the circumstances of the altercation, was admitted at trial. In the recording, Appellant told his mother that the altercation began after he arrived at Bynum's residence and Molina said, "what's up?" Appellant recalled that he began laughing and told Vanderslice that Molina was "not one for talking," and Molina responded "no." Appellant told his mother that after Molina approached him he attempted to leave, and Molina then pushed him into a door, shutting it in the process. Appellant stated on the call that "they are gonna listen to this," that Molina threw the first punch, and that he tried to "go for an open palm" to Molina's face, but Molina bit him. Appellant stated that he fell to the floor, possibly with the "help[]" of Vanderslice and attempted to "curl up into a ball." Appellant stated that Molina hit him, "stomped" on his ankle and fractured it, "stayed" on his ankle, and grabbed him by the hair while he was on the floor. Appellant said that Molina was "beating the f--k out of him" during the altercation; however, he also said that he "could have beat [Molina's] a-s." Appellant told his mother that (1) Vanderslice said that "he needed to go" after he stabbed Molina, (2) he did not dispose of his knife after he fled, and (3) "someone" told him to hide from law enforcement.

Officer Shawn Curran with the Colorado City Police Department testified about the evidence that law enforcement recovered during their investigation. He testified that law enforcement officers found a syringe and suspected narcotics on Molina's person. Appellant's knife was found at Meyer's residence, which was approximately one-hundred yards from Bynum's home.

Chief Deputy Jeremiah Witte with the Mitchell County Sheriff's Office testified that he took photographs of Bynum's home. He testified that Molina's body was found in a hallway of Bynum's residence near a doorway between the kitchen and the living room. The hallway near the kitchen led to a bathroom, a spare bedroom, and a bedroom where Bynum and her dogs were located. Deputy Witte

4

also testified that "drops of blood" were present on the back of the front door, which led into the living room, as well as "blood splatter" on a doorframe which led to the kitchen.

Ranger Vandygriff made the following observations regarding his investigation of the crime scene: (1) blood was present on a couch near the front door and an "almost unnoticeable" amount of blood was present on the front doorway; (2) large bloodstains were present on the floor in the hallway leading to the kitchen; (3) bloodstains were present on the wall and floor near a doorway leading from the kitchen into a hallway; and (4) there were two sofas in the living room, one directly in front of the entryway door and another to the right of the front or entryway door. Ranger Vandygriff testified that he interviewed Vanderslice and she indicated that the altercation between Appellant and Molina occurred near the front door; however, Ranger Vandygriff stated that there was a minimal amount of blood near the front door where Vanderslice indicated the altercation occurred, and he noted the presence of blood in the kitchen and hallway, near the area where Molina's body was recovered.

Regarding the statements made by Appellant during his interview, Ranger Vandygriff testified that, based on his observations, if Appellant's back had been against the sofa when he fell, his back could not have been against the front door.[2] Ranger Vandygriff testified that local law enforcement knew that Appellant regularly carried a knife on his person because of their previous interactions with him, but he did not know why Appellant would sharpen the serrations on the back of his knife. According to Ranger Vandygriff, when Appellant was asked where

---

[2]The substance of Ranger Vandygriff's testimony regarding Appellant's statements were corroborated by the video recording of Appellant's interview with law enforcement.

Molina was stabbed, Appellant stated that "if [Molina is] dead, I stabbed him in his chest."

Ranger Vandygriff opined that Appellant's statement that he had allegedly "blacked out" during the altercation was an attempt by Appellant to "evad[e] trying to say what happened" because Appellant's other statements about the altercation were very detailed. Ranger Vandygriff believed that (1) Appellant was conscious enough to secure the knife when he attempted to discard it, (2) Appellant initiated the altercation by telling Molina to "back up," and (3) Appellant further "engaged" Molina by failing to leave the home through the front door, thus creating a "mutual combat" scenario between them. However, Ranger Vandygriff also stated that individuals who tell law enforcement officers that they "blacked out" but still remember certain details of an event are "[n]ot [lying] all the time."

Ranger Vandygriff expressed that Appellant was dishonest during the interview, and he did not know if Appellant was being truthful as to whether (1) Appellant injured his ankle during the altercation, or (2) Appellant was "actually pinned" by Molina during the fight. When asked about alternative explanations for the cause of Appellant's injured ankle, Ranger Vandygriff opined that Appellant could have injured it when he "slipped and fell" in Bynum's home during the fight, or at some point after he left.

Ranger Vandygriff testified that Appellant's perception of Molina's actions during the altercation—that Appellant was able to recognize an opportunity to "counter" Molina's punch—was an offensive movement as opposed to a defensive one. Ranger Vandygriff believed that, if Appellant was standing near the front door, then the "defensive move would be [to] get out of the way or to try to intercept . . . the weapon or the hand or whatever is coming at you, not to counter with . . . an offensive move . . . to induce some kind of injury."

6

Ranger Vandygriff testified that Molina was stabbed in the rib cage under his left arm. Based on the location of this injury, Ranger Vandygriff believed that Molina's arms were in an upward position and could indicate that Molina was "throwing a punch" when he was stabbed. Ranger Vandygriff testified that, based on his training and experience with knives, Appellant must have exerted a significant amount of force to push a knife vertically into Molina's ribcage, "go through two horizontal ribs . . . break [Molina's] bone[s] and still penetrate to six and a half inches." According to Ranger Vandygriff, an individual who is "on the ground, pinned, and [unable to] swing [his arms]," as Appellant claims, could not inflict the type of injury that Molina sustained. Therefore, based on his investigation, Ranger Vandygriff believed that the stabbing occurred (1) when Molina "went to punch" Appellant, and (2) while Appellant was standing.

Vanderslice was at Bynum's home when the altercation occurred. She testified that Appellant and Molina had been in a relationship at some point. Vanderslice stated that she exchanged text messages with Appellant on the morning of August 8, and she told Appellant where she was. However, Appellant did not know that Molina was also at Bynum's home. Appellant arrived later while Vanderslice and Molina were "talking and laughing." Vanderslice believed that Appellant overheard Molina talking because Appellant asked "where is [Molina] at" when she answered the door. Vanderslice testified that Molina responded to Appellant's question from a nearby bathroom, stating "I'm right here." Appellant then talked to Molina while Vanderslice sat on the couch playing a game.

Vanderslice heard Appellant and Molina saying, "what's up" before they "ran at each other." Vanderslice recalled that by the time she got off the couch, Molina had "pinned" Appellant against a door and began hitting him. Appellant was "kneeling" on the floor and bleeding. Vanderslice yelled several times for the men to stop fighting, but the fight continued. At some point, Molina "stopped, like, kind

of stepped back for a minute" and ceased hitting Appellant; Appellant then stabbed Molina with a knife and fled. According to Vanderslice, the altercation occurred "really quickly," and she believed that the fight was mutual because Appellant and Molina each said, "what's up."

During cross-examination, Vanderslice testified that she believed Molina "ran at" Appellant first but clarified that "[t]hey ran at each other. . . . [And Molina] got there before [Appellant]." However, Vanderslice did not see who threw the first punch, nor did she witness some of the events that occurred because she had "turned" and "concentrated [on getting] off the couch."

Vanderslice observed that Molina had Appellant pinned on the floor, and Appellant was on his knees between a closed door, a wall, and a couch. She recalled that Appellant was not "hitting back" while Molina had him pinned. Vanderslice testified that Molina was "pounding [Appellant] . . . over and over in the head," and she believed that Molina struck Appellant between twenty-five and thirty times with his fists. Vanderslice stated that Appellant's face was covered in blood. She also recalled seeing blood "spurt[]" from Appellant's face due to his face "hitting the door."

Vanderslice estimated that she yelled at Molina approximately ten times to stop hitting Appellant, but he did not, so she called Molina "a bully." Although Molina "kind of stepped back" after she called him "a bully," she did not know if Molina intended to stop hitting Appellant or if her shouting the word "bully" caused Appellant to move. Vanderslice testified that she did not see the stabbing occur; however, she saw Appellant "jump[] up and step[] back" when Molina "slightly moved back," and that she "assume[d] that that's when [Appellant] was able to move a little bit and stab [Molina]." Vanderslice further testified that Appellant always carried a "Bowie knife" on his person and that "[i]t was part of his outfit."

Vanderslice recalled that Molina "stumble[d] back" after he was stabbed, and that he asked her to call 9-1-1. Appellant then "turned and . . . tried to run," stumbling multiple times as he exited the house. Vanderslice testified that she did not see: (1) Molina use his knee to "bang" Appellant's head against the door; (2) Molina step on Appellant's ankle during the fight; or (3) any injuries to Appellant's body.

Meyer testified that Appellant had been at her home the morning of the altercation, and that he left without telling her where he was going. Meyer stated that, twenty to thirty minutes after Appellant left, Appellant returned and ran through her back door holding a "big knife." Meyer recalled that Appellant's face was "all beat up" when he entered her home, and that Appellant was limping and had marks and blood on his face. She then asked Appellant, "who f----d you up?" Meyer stated that Appellant was speechless and appeared "[l]ost, confused, dazed," and "scared." Meyer further testified that Appellant's face was emotionless when he admitted to stabbing Molina. Appellant then left, and Meyer later found Appellant's knife in a brown paper bag at the bottom of her kitchen trash can.

Dr. Luisa Florez, a forensic pathologist, performed Molina's autopsy. Dr. Florez determined that Molina's death was caused by blood loss from the stab wound to the left side of his upper chest, which had pierced his left lung. Dr. Florez opined that the trajectory of Appellant's knife traveled from the "left to the right and a little bit downward," breaking two of Molina's ribs in the process before piercing his left lung. Dr. Florez did not observe any other injuries to Molina's body.

Dr. Florez testified that she performed a urinary drug screen and collected a sample of Molina's blood, which confirmed the presence of amphetamine, methamphetamine, and alcohol. According to Dr. Florez, an individual who uses methamphetamine could suffer from hallucinations and aggressive, agitated, or irrational behavior, such as "[w]anting to get in fights."

9

Pursuant to Appellant's request, the trial court submitted a self-defense instruction in its charge.[3] After its deliberations, the jury found Appellant guilty of murder as charged in Count One of the indictment.

## II. *Standard of Review*

We review a challenge to the sufficiency of the evidence, regardless of whether it is framed as a legal or factual sufficiency challenge, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Garcia v. State*, 667 S.W.3d 756, 761 (Tex. Crim. App. 2023); *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

Similarly, when a defendant challenges the sufficiency of the evidence to support the rejection of a defensive theory asserted by him, such as self-defense, we examine all the evidence in the light most favorable to the verdict to determine whether a rational jury could have found the defendant guilty of all essential elements of the charged offense beyond a reasonable doubt and also could have found against the defendant on the self-defense issue beyond a reasonable doubt. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991); *see also Braughton v. State*, 569 S.W.3d 592, 609 (Tex. Crim. App. 2018) (reaffirming *Saxton*).

---

[3]In most scenarios, a defendant who uses deadly force against an unarmed victim is not entitled to a self-defense instruction. *See Luna v. State*, 687 S.W.3d 79, 109 n.7 (Tex. App.—Eastland 2024, pet. ref'd) (compiling cases involving unarmed victims where a defendant was not entitled to a deadly-force self-defense instruction).

To support a claim of self-defense, the defendant bears the burden to produce some evidence to support the defense; the State bears the burden of persuasion to disprove it. *Braughton*, 569 S.W.3d at 608 (citing *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton*, 804 S.W.2d at 913–14). Once the defendant produces that evidence, the State's burden does not require the production of additional evidence to disprove the defense; instead, it requires only that the State prove the defendant's guilt beyond a reasonable doubt. *Zuliani*, 97 S.W.3d at 594–95. Furthermore, because the State must rebut a defensive issue by establishing the defendant's guilt beyond a reasonable doubt, we review sufficiency challenges to the jury's rejection of a defensive issue under the traditional legal sufficiency standard. *Smith v. State*, 355 S.W.3d 138, 145 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *see also Saxton*, 804 S.W.2d at 914.

When a defendant raises a justification defense, such as self-defense, a determination of guilt by the jury is an implicit rejection of the defensive theory. *Zuliani*, 97 S.W.3d at 594–95; *Saxton*, 804 S.W.2d at 914; *see also Miller v. State*, 712 S.W.3d 235, 250 (Tex. App.—Eastland 2025, pet. filed). As such, because a claim of self-defense is a fact issue to be determined by the jury, the jury is free to accept or reject the defensive theory, either version of the facts, and any part of a witness's testimony. *Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018); *see Saxton*, 804 S.W.2d at 912 n.3.

Viewing the evidence in the light most favorable to the verdict requires that we consider all the evidence admitted at trial, including improperly admitted evidence. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Brooks*, 323 S.W.3d at 899; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Lee v. State*, 676 S.W.3d 912, 915 (Tex. App.—Eastland 2023, no pet.). As such, we defer to the factfinder's credibility and weight determinations because the factfinder is the sole judge of the witnesses' credibility and the weight their

11

testimony is to be afforded. *See* TEX. CODE CRIM. PROC. ANN. art. 36.13 (West 2007); *Garcia*, 667 S.W.3d at 762; *Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899; *Clayton*, 235 S.W.3d at 778. This deference accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Garcia*, 667 S.W.3d at 761; *Clayton*, 235 S.W.3d at 778. We may not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the factfinder. *Garcia*, 667 S.W.3d at 762; *Winfrey*, 393 S.W.3d at 768; *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Therefore, if the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Garcia*, 667 S.W.3d at 762; *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Clayton*, 235 S.W.3d at 778.

Because the standard of review is the same, we treat direct and circumstantial evidence equally. *Isassi*, 330 S.W.3d at 638; *Clayton*, 235 S.W.3d at 778; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). It is not necessary that the evidence directly prove the defendant's guilt. Rather, circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor and can, without more, be sufficient to establish his guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper*, 214 S.W.3d at 13); *Lee*, 676 S.W.3d at 915. A guilty verdict does not require that every fact must directly and independently prove a defendant's guilt if the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Therefore, in evaluating the sufficiency of the evidence, we must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015).

### III. *Analysis*

In his sole issue, Appellant argues that the evidence is insufficient to support the jury's rejection of his claim of self-defense.

A person commits the offense of murder if he "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." PENAL § 19.02(b)(2). The indictment alleged that Appellant, "with intent to cause serious bodily injury to [Molina], . . . commit[ed] an act clearly dangerous to human life that caused the death of [Molina] by stabbing him." It is undisputed that Appellant murdered Molina, and Appellant concedes on appeal that there is sufficient evidence for the jury to have found the essential elements of this offense beyond a reasonable doubt. Instead, Appellant only challenges the sufficiency of the evidence to support the jury's rejection of his claim of self-defense.

Under appropriate circumstances, a defendant may affirmatively raise the claim of self-defense to a prosecution for murder if the use of force is "justified." *Braughton*, 569 S.W.3d at 606 ("It is a defense to prosecution that the conduct in question is justified under this chapter." (quoting PENAL § 9.02)); *see also Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017); *Barron v. State*, 630 S.W.3d 392, 403–04 (Tex. App.—Eastland 2021, pet. ref'd). In asserting self-defense, the use of force is justified "when and to the degree the [defendant] reasonably believes the force is immediately necessary to protect the [defendant] against the other's use or attempted use of unlawful force." PENAL § 9.31(a). Similarly, the use of deadly force against another is justified under the above circumstances "if the [defendant] would be justified in using force against the other" under Section 9.31, and "when and to the degree the [defendant] reasonably believes the deadly force is immediately necessary . . . to protect the [defendant] against the other's use or attempted use of unlawful deadly force." *Id.* § 9.32(a).

13

"The *reasonably believes* language within these statutes contain subjective and objective components." *Lozano v. State*, 636 S.W.3d 25, 32 (Tex. Crim. App. 2021) (emphasis added). First, a "defendant must subjectively believe that another person used or attempted to use unlawful force (Section 9.31) or deadly force (Section 9.32) against the defendant and that the defendant's use of unlawful or deadly force in response was immediately necessary." *Id.* "'*Deadly force*' means force that is intended or known by the [defendant] to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." PENAL § 9.01(3) (emphasis added). Second, a defendant's belief must be objectively reasonable, because a *reasonable belief* is one that would be held by an ordinary and prudent person in the same circumstances as the defendant. *Id.* § 1.07(a)(42). A defendant's belief that deadly force was immediately necessary is presumed to be reasonable if (1) the defendant knows or has reason to believe that the person against whom the deadly force was used was committing or attempting to commit an enumerated offense as described by Section 9.32; (2) the defendant did not provoke the person against whom the force was used; and (3) the defendant was "not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used." *See id.* § 9.32(b).

Evidence of self-defense may be raised by "other witnesses' testimony about the defendant's acts and words at the time of the offense." *Lozano*, 636 S.W.3d at 33 (citing *Smith v. State*, 676 S.W.2d 584, 585 (Tex. Crim. App. 1984)).

Appellant asserts that the evidence is insufficient for a rational jury to find against him on the issue of self-defense because the evidence adduced at trial established that (1) Molina was the initial aggressor, and (2) Appellant subjectively believed that deadly force was immediately necessary to repel Molina's unlawful use or attempted use of deadly force against him.

14

At the outset, we note that the primary sources of evidence upon which Appellant relies to support his claim of self-defense are derived from certain statements that he made to law enforcement during his recorded interview, and other statements that he made to his mother during a recorded jail telephone call. As such, Appellant's theory of self-defense was inherently a credibility determination for the jury to resolve, and because it was, the jury was free to reject it. *See Saxton*, 804 S.W.2d at 914; *see also Braughton*, 569 S.W.3d at 611–13; *Barron*, 630 S.W.3d at 404.

Additionally, and as we will explain, there is sufficient evidence to support the jury's rejection of Appellant's claim of self-defense. First, a reasonable jury could have logically concluded that Appellant provoked the altercation with Molina, thus rebutting the presumption that Appellant's belief that his use of deadly force was reasonable under the circumstances. *See* PENAL § 9.32(b); *see also Harrell v. State*, No. 11-22-00261-CR, 2024 WL 39936, at *3–4 (Tex. App.—Eastland Jan. 4, 2024, no pet.) (mem. op., not designated for publication). Second, the evidence also supports the jury's rejection of Appellant's claim that he subjectively believed that his use of deadly force was immediately necessary to protect him against Molina's use or attempted use of unlawful force, or that Molina attempted to commit or did commit one of the offenses enumerated in Section 9.32(a), such as murder. *See* PENAL §§ 9.31(a), 9.32(a)(2)(B); *see also Lozano*, 636 S.W.3d at 32–33.

Appellant argues that the following evidence demonstrates that Molina provoked the altercation, and that the jury acted irrationally when it did not find in favor of Appellant on his claim of self-defense: (1) Vanderslice's testimony that Molina was the initial aggressor; (2) the toxicology reports and Dr. Florez's testimony that Molina was intoxicated and under the influence of illegal drugs at the time of the altercation, which could have contributed to any violent behavior

demonstrated by Molina that day; and (3) the statements Appellant made during his interview with law enforcement and the recorded jail telephone call with his mother.

As for who provoked the altercation, Vanderslice testified that (1) the fight appeared to be "mutual" based on Appellant's and Molina's interactions prior to the fight, and (2) she did not observe who threw the first punch. Ranger Vandygriff testified that, based on his investigation and the statements made by Appellant during his recorded interview, he believed that Appellant initiated the altercation by telling Molina to "back up" and that Appellant "engaged" Molina, which provoked the altercation. Ranger Vandygriff also testified that the fight became "mutual combat" when Appellant and Molina "got together [and] pushed." During Appellant's recorded interview with law enforcement, he mimed a pushing motion with his hands when recounting to law enforcement that he told Molina to "back up" prior to the altercation. Appellant also stated during the interview that Molina pushed him before the altercation started. In his recorded jail telephone call with his mother, Appellant said that he "tried to leave" before Molina pushed him into a door and began hitting him.

While some of Appellant's statements regarding the circumstances of the altercation were consistent with certain testimony and evidence adduced at trial and may have, if believed, indicated that he did not provoke the altercation, the jury was not required to accept Appellant's version of events simply because some evidence or witness testimony supported it. *See Braughton*, 569 S.W.3d at 609; *Saxton*, 804 S.W.2d at 914. Further, when the record supports conflicting inferences, as it does here, we presume that the factfinder resolved the conflicts in favor of the verdict. *Jackson*, 443 U.S. at 326; *Garcia*, 667 S.W.3d at 762. The jury was free to assess the credibility of the witnesses and determine, based on the evidence presented, that Appellant provoked the altercation with Molina. *See Brooks*, 323 S.W.3d at 899; *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13; *Barron*, 630 S.W.3d at 404.

16

As such, we conclude that there is sufficient evidence, consistent with the jury's verdict, that the presumption of reasonableness in Section 9.32(b) does not apply. *See* PENAL § 9.32(b); *see also Harrell*, 2024 WL 39936, at *5.

Appellant also asserts that he subjectively believed that his use of deadly force was immediately necessary because: (1) Molina was "an intoxicated aggressor"; (2) Molina used or attempted to use unlawful deadly force against Appellant during the altercation; (3) Appellant sustained a fractured ankle during the altercation; and (4) Vanderslice's testimony showed that Molina "pinned" Appellant on the floor where he could not move, struck Appellant several times on the head with his fists, and did not stop hitting Appellant on the head until he used deadly force. Appellant cites to decisions from this court and our sister courts to support his argument that the use of an individual's fists or feet may constitute a deadly weapon.[4] However, these decisions are distinguishable—in each case, *the defendant* used his hands or fists to strike the victim—and do not support Appellant's contention that the jury acted irrationally when it rejected his claim of self-defense.

---

[4]*See Quincy v. State*, 304 S.W.3d 489, 499–500 (Tex. App.—Amarillo 2009, no pet.) (holding that there was sufficient evidence to show that a "closed fist" was a deadly weapon where the *defendant* struck a victim on the head with his closed fist and the victim sustained a serious bodily injury as a result); *Brooks v. State*, 900 S.W.2d 468, 472–73 (Tex. App.—Texarkana 1995, no pet.) (holding that sufficient evidence existed to show that a *defendant's* hands were a deadly weapon where "[the defendant] knocked [the victim] unconscious with a single blow and then sat astride his chest and pounded his face and head with both fists" and caused the victim to sustain a traumatic brain contusion); *Clark v. State*, 886 S.W.2d 844, 845 (Tex. App.—Eastland 1994, no pet.) (holding that sufficient evidence supported a jury's finding that a *defendant* used a deadly weapon—his hands or feet—where the defendant struck and kicked the two-year-old child); *Haney v. State*, No. 06-21-00094-CR, 2022 WL 1546722, at *6–7 (Tex. App.—Texarkana May 17, 2022, no pet.) (mem. op., not designated for publication) (holding that fists were used as deadly weapons where the *defendant* hit his girlfriend in the face with his hands causing fatal injuries); *White v. State*, No. 06-18-00205-CR, 2019 WL 2307360, at *2 (Tex. App.—Texarkana May 31, 2019, no pet.) (mem. op., not designated for publication) (holding that fists were used as deadly weapons where the *defendant* punched a correctional officer in the side of his head causing severe trauma); *Rose v. State*, No. 05-94-01926-CR, 1996 WL 729922, at *3–4 (Tex. App.—Dallas Dec. 5, 1996, pet. ref'd) (not designated for publication) (holding that fists were used as deadly weapons where a *defendant* punched a victim in the head).

17

We do not dispute the general rules or legal principles as stated in the cases cited by Appellant, and we acknowledge that circumstances may arise where a rational jury could determine that one's hands or feet may be used as a deadly weapon. *See Lane v. State*, 151 S.W.3d 188, 191 (Tex. Crim. App. 2004) (stating that a hand or a foot may be a deadly weapon "depending upon the evidence shown" (quoting *Turner v. State*, 664 S.W.2d 86, 90 (Tex. Crim. App. 1983))). However, these cases do not support Appellant's contention that Molina's use of his hands and the alleged use of his feet "supports the [purported] reasonableness of [Appellant's] belief that Molina was using or attempting to use unlawful deadly force against him." Moreover, as it relates to Appellant's injuries, while the evidence shows that several individuals observed an injury to Appellant's ankle, it is unclear when Appellant injured his ankle or the severity of any head injuries he might have sustained because of the altercation.

Here, it is undisputed that Molina was unarmed during the altercation. Additionally, there is no evidence that Molina made any verbal threats of violence toward Appellant during the altercation, nor is there any indication that Molina intended to use unlawful deadly force against Appellant. *See Hall v. State*, 640 S.W.3d 333, 346 (Tex. App.—Houston [14th Dist.] 2022, pet. ref'd). Thus, the jury could have rationally found that Appellant's use of deadly force was neither reasonable nor justified under the circumstances. *See Bundy v. State*, 280 S.W.3d 425, 434–35 (Tex. App.—Fort Worth 2009, pet. ref'd) (defendant's use of deadly force was not a justifiable response to another's attempt to punch the defendant); *Schiffert v. State*, 257 S.W.3d 6, 14 (Tex. App.—Fort Worth 2008, pet. ref'd) (A punch to the defendant's face did not sufficiently demonstrate an "attempt to use deadly force" so as to justify the use of deadly force in response, and a reasonable jury could not have found that the defendant's use of deadly force was justified

where the defendant provoked the altercation and the victim did not use or attempt to use deadly force against the defendant.); *see also Hall*, 640 S.W.3d at 346.

Further, even though there is some evidence that Molina was under the influence of illegal drugs and alcohol, before and during the altercation, and that law enforcement recovered a syringe and suspected narcotics on Molina's person, there is no evidence that Appellant was aware of Molina's intoxicated state. As such, merely because Molina was intoxicated at the time or because an intoxicated individual can be aggressive or violent is alone insufficient to support Appellant's claimed subjective reasonable belief that his use of deadly force was immediately necessary. *See Bundy*, 280 S.W.3d at 434–35.

Vanderslice testified that Molina took a step back; then, at some point, Appellant stabbed Molina after Molina stopped hitting him. Ranger Vandygriff indicated that, based on his investigation and observation of the crime scene, he believed that the altercation occurred near the hallway and kitchen area as opposed to the front door. Ranger Vandygriff also testified that he could not determine when Appellant injured his ankle, and that Appellant's injury could have occurred when he "slipped and fell" in Bynum's home while trying to flee, or at another point in time after he left her home. Furthermore, Ranger Vandygriff testified that Appellant's injuries appeared to be minor when he observed Appellant during the recorded interview, and that Appellant's statements to law enforcement indicated that the stabbing was an "offensive" movement by Appellant, as opposed to a "defensive" one.

As we have said, Appellant's claim of self-defense was inherently a credibility determination for the jury to resolve. *See Febus*, 542 S.W.3d at 572; *Barron*, 630 S.W.3d at 404. The jury was free to disregard Appellant's claim, and its determination of Appellant's guilt is tantamount to a rejection of his claim and version of events. *See Braughton*, 569 S.W.3d at 611–13; *Saxton*, 804 S.W.2d at

19

914; *Barron*, 630 S.W.3d at 404. As such, viewing the evidence in the light most favorable to the jury's verdict, we conclude that the record contains sufficient evidence from which a rational jury could have found beyond a reasonable doubt all the essential elements of murder, and also could have found against Appellant on his claim of self-defense beyond a reasonable doubt. *See Brooks*, 323 S.W.3d at 899; *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13.

Accordingly, we overrule Appellant's sole issue on appeal.

## IV. *This Court's Ruling*

We affirm the judgment of the trial court.


W. STACY TROTTER

JUSTICE


February 27, 2026

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.